# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 24, 2013

No. 10-60559

Lyle W. Cayce
Clerk

NEVADA PARTNERS FUND, L.L.C., by and through Sapphire II, Incorporated. Tax Matters Partner

      Plaintiff - Appellant Cross-Appellee

v.

UNITED STATES OF AMERICA, by and through its agent, the Internal Revenue Service

      Defendant - Appellee Cross-Appellant

--------------------------------------------------------------------------------------------------

CARSON PARTNERS FUND, L.L.C., by and through Sapphire II, Incorporated, Tax Matters Partner

      Plaintiff - Appellant Cross-Appellee

v.

UNITED STATES OF AMERICA, by and through its agent, the Internal Revenue Service

      Defendant - Appellee Cross-Appellant

--------------------------------------------------------------------------------------------------

RENO PARTNERS FUND, L.L.C., by and through Carson Partners Fund, L.L.C., Tax Matters Partner,

      Plaintiff - Appellant Cross-Appellee

v.

No. 10-60559

UNITED STATES OF AMERICA, by and through its agent, the Internal Revenue Service,

Defendant - Appellee Cross-Appellant

-------------------------------------------------------------------------------------------------

CARSON PARTNERS FUND, L.L.C., by and through Nevada Partners Fund, L.L.C., Tax Matters Partner

Plaintiff - Appellant Cross-Appellee

v.

UNITED STATES OF AMERICA, by and through its agent, the Internal Revenue Service

Defendant - Appellee Cross-Appellant

-------------------------------------------------------------------------------------------------

RENO PARTNERS FUND, L.L.C., by and through Delta Currency Management Company, Tax Matters Partner

Plaintiff - Appellant Cross-Appellee

v.

UNITED STATES OF AMERICA, by and through its agent, the Internal Revenue Service

Defendant - Appellee Cross-Appellant

-------------------------------------------------------------------------------------------------

CARSON PARTNERS FUND, L.L.C., by and through Bricolage Capital Management Company, Tax Matters Partner

Plaintiff - Appellant Cross-Appellee

v.

UNITED STATES OF AMERICA, by and through its agent, the Internal Revenue Service

Defendant - Appellee Cross-Appellant

-------------------------------------------------------------------------------------------------

2

No. 10-60559

NEVADA PARTNERS FUND, L.L.C., by and through Bricolage Capital Management Company, Tax Matter Partner

Plaintiff - Appellant Cross-Appellee

v.

UNITED STATES OF AMERICA, by and through its agent, the Internal Revenue Service

Defendant - Appellee Cross-Appellant

———————————

Appeals from the United States District Court
for the Southern District of Mississippi

———————————

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

This appeal arises from eleven notices of final partnership administrative adjustment (FPAAs) issued by the IRS with respect to three Limited Liability Companies (LLCs) treated as partnerships for tax purposes:[1] Nevada Partners Fund, LLC ("Nevada"), Carson Partners Fund ("Carson"), and Reno Partners Fund, LLC ("Reno") (collectively, the "plaintiffs" or "partnerships"). *See* 26 U.S.C. §§ 6223, 6226(a). The FPAAs eliminated approximately $18 million of claimed tax losses and determined that penalties were applicable. According to the IRS, the partnerships' transactions provide one partner, James Kelley

---

[1] The Internal Revenue Code does not address or define limited liability companies, which are business entities established under state law. *See* 26 C.F.R. § 301.7701-1(a)(1) ("Whether an organization is an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend on whether the organization is recognized as an entity under local law."). The Treasury Regulations allow an LLC to "elect its classification for federal tax purposes"; the regulations treat a multi-owner LLC as either an association or partnership, and treat a single-owner LLC as an association or "to be disregarded as an entity separate from its owner," at the LLC's election. *Id.* § 301.7701-3(a)-(b); *see McNamee v. Dep't of the Treasury*, 488 F.3d 100, 107-09 (2d Cir. 2007).

3

No. 10-60559

Williams, with an illegal tax shelter to avoid taxes on his unrelated personal capital gain of the same approximate amount. The partnerships challenged the FPAAs by timely filing eleven suits consolidated in the district court pursuant to 26 U.S.C. § 6226(b)(1). After a bench trial, the district court entered final judgment and a memorandum opinion upholding the IRS's disallowance of the claimed loss and upholding two of the three asserted penalties. *Nevada Partners Fund, LLC ex rel. Sapphire II, Inc. v. United States*, 714 F. Supp. 2d 598 (S.D. Miss. 2010). The partnerships timely appealed and the government cross-appealed. We affirm in part and vacate in part.

## I.

### A.    The FOCus Program[2]

James Kelley Williams, an experienced and highly successful Mississippi businessman, expected to realize a large capital gain in the 2001 tax year—$18 million from the cancellation of Williams' liability on a loan he had guaranteed.[3] Because of this expected gain, Williams conferred with his accountant and tax advisor, KPMG, LLP, and his attorneys at Baker Donelson, PC. At a meeting with them on October 2, 2001, KPMG agents gave a PowerPoint presentation to Williams and his attorneys that described a long-term investment program offered by Bricolage Capital, LLC ("Bricolage"), called the Family Office Customized or "FOCus" program. According to the PowerPoint presentation, the FOCus program had a "structure [that] may result in favorable income tax

---

[2] Because we review the district court's findings of fact for clear error, we "'review . . . the entire record,'" *Mo. Pac. R.R. v. R.R. Comm'n of Tex.*, 948 F.2d 179, 182 (5th Cir. 1991) (quoting *Carr v. Alta Verde Indus.*, 931 F.2d 1055, 1058 (5th Cir. 1991)), not only the facts explicitly found or relied upon by the district court.

[3] Dollar figures are generally rounded in this opinion for the purpose of clarity. *Kornman & Assoc., Inc. v. United States*, 527 F.3d 443, 446 n.3 (5th Cir. 2008); *see Cemco Investors, LLC v. United States*, 515 F.3d 749, 750 (7th Cir. 2008).

4

No. 10-60559

consequences [ ] to the investor" and explained that the program was expected to yield a tax benefit with zero net capital gains and losses.[4]  The PowerPoint indicated that the favorable income tax consequences would be approved in a "'more likely than not' tax opinion from Arnold & Porter LLP."  In an internal memorandum, KPMG referred to this program as an "investment vehicle with a tax loss-generator possibility for th[at] year."

The history of the FOCus program can be traced to earlier in 2001. Bricolage formulated the program for its clients who wished to obtain favorable tax treatment of certain assets.  Bricolage enlisted Credit Suisse-First Boston ("Credit Suisse") as the bank that would be essential to the program, which would involve using LLCs or partnerships in "execut[ing] foreign exchange transactions in conjunction with a larger tax-motivated transaction . . . that generates tax losses for clients of Bricolage."  An internal Credit Suisse memorandum[5] concisely set forth how these trades would produce a tax benefit for the investor:

> Clients of Bricolage will invest in an investment partnership that has embedded losses that have not yet been realized for tax purposes.  The clients will guarantee liabilities of the investment partnership to create sufficient tax basis to recognize such losses without any limit, and the losses will be triggered and allocated to the clients.  The Transaction results in the allocation of an ordinary tax loss to an investor that economically did not suffer the loss.

---

[4] The slides that followed showed examples of how the FOCus transaction would work, claiming, for instance, that with a "[c]apital [l]oss from FOCus investments" perfectly offsetting an investor's capital gain, the investor's net income tax liability would be $0, with an "[e]xpected tax benefit" of $20 million on a hypothetical $100 million capital gain.

[5] The Partnerships argue that we should not consider the Credit Suisse memorandum because the district court did not "adopt" it in its opinion.  However, the district court properly admitted the memorandum into evidence and, as noted above, our review of the district court's factual findings is for clear error, requiring a review of the "whole record." *E.g.*, *Mo. Pac. R.R.*, 948 F.2d at 182.  We may therefore consider the memorandum.

No. 10-60559

As described to Williams in the KPMG PowerPoint, Bricolage's FOCus program entailed a three-tiered investment strategy that would produce the desired deductible tax loss. The first tier of this strategy involved the investment manager establishing an LLC with a transitory partner to act as a holding company for other funds (known as a "fund of funds"). The first-tier LLC would own 99% of a second LLC, which in turn would own 99% of a third LLC. Initially, the transitory partner would own a 99% interest in the first-tier LLC, with 1% interest in each LLC held by Bricolage. The two lower-tiered LLCs would engage in the transactions that would produce the desired tax loss. The third-tier LLC would enter into sets of currency forward contracts, or "straddle" trades, that would produce offsetting gains and losses. In the "gain" legs of the straddle trades, the gains would be realized and reported as income by the 99% transitory partner; while the losses in the other legs would be suspended in the books of the third-tier LLC. At that point, the investor-client would purchase the transitory partner's interest in the LLCs. The second-tier LLC would then obtain a Credit Suisse loan guaranteed by the investor that would be used to engage in a limited-risk foreign currency trade. The investor's guarantee of the loan would give him enough basis[6] in the LLCs to take advantage of the embedded loss they had generated.[7] Finally, after the investor had offset the large tax gain with the embedded loss, the FOCus program called for the

---

[6] *See* 26 U.S.C. § 752(a) ("Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.").

[7] Taxpayers who choose partnership tax treatment can only deduct losses from their taxable income to the extent of their basis in the partnership. *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 542 & n.1 (5th Cir. 2009); *see* 26 U.S.C. § 731(a)(2) (providing that "loss shall be recognized [only] to the extent of the excess of the adjusted basis of [a] partner's interest in the partnership" as adjusted and calculated by statute).

investor to conduct more traditional investments with Bricolage. In addition to the foregoing benefits, Bricolage would furnish a legal opinion letter from the law firm of Arnold & Porter, LLP, approving of the tax treatment of this investment structure.[8]

Following Williams' October 2, 2001, meeting, Bricolage began to carry out the FOCus strategy described in the PowerPoint presentation. Bricolage utilized three LLCs in which it already owned interests, Nevada Partners, Carson Partners, and Reno Partners. They became, respectively, the first-, second-, and third-tier LLCs in the FOCus Program. The initial transitory 99% owner of Nevada was Pensacola PFI Corp. ("Pensacola"), an S-corporation whose directors were two Bricolage principals, Andrew Beer and Samyak Veera. The two shareholders of Pensacola were two LLCs wholly owned, respectively, by Andrew Ahn and Jason Chai, two investors with connections to Bricolage. Bricolage Capital Management Company retained a 1% ownership interest in Nevada and Carson, and the 1% owner of Reno was Delta Currency Management Co., another Bricolage-affiliated company owned by Beer and Veera.[9]

Pursuant to the FOCus plan, between October and December of 2001, Reno engaged in foreign currency straddle transactions, which resulted in approximately eighty closely offsetting loss and gain "legs," as described in the FOCus program documents. These trades were conducted through Credit Suisse and resulted in approximately $18 million in gains and $18 million in losses.[10]

---

[8] However, when the letter was actually issued in 2002, it stated that "it is more likely than not that the series of transactions analyzed in this opinion are the same as, or substantially similar to," certain transactions the IRS had identified as abusive tax shelters. The letter simply disagreed with the IRS' legal assessment of the transactions as tax shelters.

[9] Later in November, Pensacola distributed its 99% ownership interest to Ahn and Chai's LLCs as a part of the FOCus plan.

[10] Initially the straddle trades resulted in $18 million in gains and $17 million in losses, and the $17 million in losses were embedded by the process described below. However, this process did not take advantage of all of the loss legs that Reno generated; as described in

No. 10-60559

In order to begin the process of separating the corresponding gains and losses, Pensacola distributed its 99% ownership interest in Nevada to the two LLCs owned by Ahn and Chai. As more than fifty percent of the interest in Nevada was sold or exchanged in this transaction, it resulted in the "technical termination" of Nevada and the lower-tier LLCs for that tax year,[11] meaning that Reno closed its books for tax purposes and reopened them the next day. Because Reno's tax year had closed, it was required to declare, or "mark to market," certain of the gains and losses on its straddle trades.[12] Reno did so, and the gains flowed up the partnership chain to Ahn and Chai's LLCs. Ahn and Chai ultimately reported the gains on their respective tax returns for 2001. However, because the parties involved in the transaction were "related parties," they could only claim the gains from the straddle trades, and could not yet claim the losses.[13] Accordingly, the loss legs were suspended (*i.e.*, not currently recognized for tax purposes), while the gain legs were reported on the tax returns of the owners of the transitory partners who evidently could fiscally

_____

further detail below, Reno settled five remaining loss legs in December of 2001, which resulted in another $1 million in ordinary losses being embedded, for a total of approximately $18 million in losses to offset the $18 million in gains. *See id.*

[11] *See* 26 U.S.C. §§ 708(b)(1)(B), 761(e); *see also* 26 C.F.R. § 1.708-1(b)(2) (providing that, if there is a sale or exchange of an interest in an upper-tier partnership that results in a § 708(b) termination of the upper tier partnership, then the transaction also effects a technical termination of any lower-tier partnerships).

[12] *See* 26 U.S.C. § 1256. Section 1256 covers foreign currency contracts, which included a number of the straddle trades Reno had completed. *See id.* § 1256(b)(1)(B).

[13] *Id.* § 707(b)(1). Section 707(b)(1), "Losses disallowed," provides, in relevant part: "No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between—(A) a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or the profits interest, in such partnership, or (B) two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests."

8

absorb them.[14]    Thus, Bricolage had achieved its first goal of creating an embedded loss that one of its investor-clients could later claim for tax purposes.

Between October 2, 2001, and December 4, 2001, Williams, through his attorneys at Baker Donelson, kept in close contact with the Bricolage principals and KPMG.  During that time, he was kept apprised of the LLCs' progress in implementing the FOCus steps; he, his son, and his attorney negotiated the terms of the partnership operating agreement with Bricolage and the fees to be paid to Bricolage, KPMG, and Arnold & Porter; and he informed Bricolage that he would need to claim approximately $18 million in losses, including $17 million in capital losses and $1 million in ordinary losses on his 2001 personal income tax return.

On December 4, 2001, Williams made his initial investment called for by the FOCus program.  Acting on behalf of the JKW 1991 Revocable Trust ("the Williams Trust"), which held most of Williams' substantial wealth, Williams purchased a 99% interest in Nevada Partners from Ahn and Chai's holding companies for approximately $883,000.  Bricolage retained the remaining 1% interest.  Bricolage was named the "Administrative Member," giving it the power and duty to approve any purchase of the Nevada partnerships.  Then, on December 12, 2001, the Williams Trust purchased Nevada's 99% interest in Carson Partners for approximately $523,0000, with Bricolage again retaining a 1% interest.  Williams became the "Controlling Member" of Carson and retained decision-making authority.  Following this purchase, the Williams Trust increased its basis in Carson by transferring equity interests and approximately $1.1 million in cash into Carson.  This transaction gave Williams a tax basis in Carson valued at approximately $9.7 million, slightly more than half of the basis

---

[14] The plaintiffs argue that Ahn and Chai's tax returns were never formally admitted into evidence during the bench trial.  However, the plaintiffs stipulated to the relevant information contained therein.

needed for Williams to take advantage of Carson's anticipated $18 million embedded loss.[15]

In mid-December of 2001, Reno settled five remaining open loss legs, producing approximately $1 million in ordinary losses. The losses flowed up the partnership chain to Williams, who reported them as ordinary losses on his 2001 tax return. On December 21, 2001, Carson sold its 99% interest in Reno to another corporation owned by Bricolage principals for its fair market value of just under $168,000. This sale triggered a $17 million capital loss for Carson due to Reno's embedded loss, which Carson later reported.[16] At that time, Williams had a 99% share of that loss. However, Williams did not yet have enough basis in Carson to take full advantage of these losses to offset the taxes on his capital gains.

Thus, the next step was to increase Williams' basis in Carson so that he could take advantage of the loss for tax purposes. Consistent with the plan, on December 20, 2001, Williams signed a personal guarantee of a $9 million loan from Credit Suisse to Carson for the purpose of engaging in a deep-in-the-money foreign exchange transaction involving Japanese Yen (JPY).[17] This transaction,

---

[15] During the October 2, 2001 presentation, a KPMG agent explained that requiring a capital commitment equal to fifty percent of the desired loss was necessary to avoid then-applicable tax-shelter registration requirements. *See* 26 U.S.C. § 6111(a), (c) (2000).

[16] This step was a deviation from the prearranged FOCus scheme. The KPMG PowerPoint presentation provided that the LLCs would terminate all of the "loss" legs, triggering the entire amount of desired ordinary losses. Instead, to generate the desired $18 million loss, Reno terminated only five of the loss legs, resulting in $1 million in ordinary losses, and Carson then triggered the $17 million in capital losses by selling its interest in Reno. However, as noted above, Williams sought to offset his $17 million in capital gains and $1 million in ordinary gains. To the extent that the Nevada Partners transactions deviated from the PowerPoint plan in this respect, the deviation appears to have been consistent with Williams' needs.

[17] Specifically, Carson borrowed 1,155,600,000 JPY from Credit Suisse, to be repaid on March 13, 2002 at the "extremely low" annual interest rate of 0.12%. This meant that Carson's Yen repayment obligation on that date was about 1,155,905,763 JPY. On the same day, Carson converted those loan proceeds from the Yen into the U.S. Dollar, which yielded

known as a "carry trade," utilized the spread in value between the Japanese Yen and the U.S. Dollar. During the three-month term of the loan, Carson and Credit Suisse limited their exposure to exchange-rate fluctuations by means of a narrow risk "collar," which ensured that, regardless of the Dollar-Yen exchange rate on the maturation date, Carson stood to gain at most $77,000 or to lose at most $90,000. Carson ultimately gained $51,000 on the transactions.

As Dr. Timothy M. Weithers, the government's expert, explained in his testimony and report, investment in the Yen at that time in theory made good economic sense because the Japanese economy was weak and the Yen was expected to decline. However, as Weithers stated in his report, instead of fully taking advantage of profits in this economic situation, Carson took an "unorthodox" approach by imposing the collar, essentially the equivalent of buying "insurance against a depreciation of the USD (the exact opposite of what this strategy requires)." Weithers concluded that, without the collar on the Yen trade, the potential profits would have been many times greater than the $51,000 earned. Moreover, according to the testimony of Gary Gluck of Credit Suisse, Williams' personal guarantee of the loan was not required by the bank as a condition of the loan because the Carson foreign exchange trade had a very limited risk exposure (to a maximum of $90,000) due to the collar, and Carson deposited as collateral an amount sufficient to cover that small risk.[18] Nevertheless, Williams, acting on Bricolage's advice, provided his personal guarantee anyway so as to increase his basis in Carson by another $9 million.

Williams paid Bricolage a fee of $845,000, a figure that the record suggests was derived from a negotiated 7% of the $18 million desired loss, less the fees for

---

$9 million; Carson then used that $9 million to purchase the deep-in-the-money "call spread" from Credit Suisse, exercisable on March 13, 2002. In effect, the purchased Yen never left the possession of Credit Suisse.

[18] *Nevada Partners*, 714 F. Supp. 2d at 618.

Arnold & Porter, KPMG, and funds to be used as collateral for the Yen carry trades.[19] The fee was negotiated between October and December of 2001, and was paid in early 2002. In April of 2002, Arnold & Porter sent Williams its engagement letter committing to furnish Williams with its legal opinion. On October 11, 2002, Arnold & Porter sent Williams two tax opinion letters, one for him and another for him and Carson, concluding that more likely than not the tax shelters analyzed therein would survive IRS challenge. Williams claimed the Reno-Carson embedded loss on his 2001 tax return, which he filed on October 15, 2002.

From March 2002 forward and in following years, on Bricolage's recommendation, Williams made more traditional and straightforward investments through Carson for profit in hedge funds, foreign exchange, and private equities. These transactions were not designed to create losses or to tightly rein in gains, and, consequently, they were very profitable. During this time, Williams took full advantage of the Dollar-Yen spread, which ultimately earned him $8 million. From 2002 through 2007, he earned $23 million from investments in various hedge funds and energy equity funds with Bricolage. Williams reported and paid the taxes due on those earnings. As the district court found, "[t]his investment activity was carried on independently of the 2001 FOCus steps."[20]

---

[19] As John Beard, Williams' attorney at Baker Donelson, explained in his testimony: 7% of $18 million is $1.26 million, which was divided as follows: $90,000 (Yen "collar fund") + $225,000 (KPMG's fee of 1.25% of the $18 million loss) + $100,000 (Arnold & Porter's fee) + $845,000 (Bricolage's fee from the remaining 7%) = $1.26 million.

[20] *Id.* at 619; *see id.* at 620, 630-33 ("The evidence clearly shows a division, a line of demarcation, between the events from December 4, 2001 to December 21, 2001, and the investment activity that took place after January 1, 2002. Either set of events could have taken place wholly without the other. . . . [T]he Reno foreign currency straddle and the Carson foreign currency trades . . . from October to December of 2001 were not part of the highly successful Yen trading through Carson in which Williams participated after 2002. This trading was unrelated both in purpose and outcome to the Reno straddle. . . . The FOCus

No. 10-60559

## B.    *IRS Tax Shelter Notices and Investigation of FOCus Program*

In September of 2000, the IRS issued a notice alerting taxpayers that it intended to regulate certain abusive tax shelters, *see* IRS Notice 2000-44, that were similar in several respects to the FOCus program.  The IRS identified certain arrangements of tiered partnerships to be abusive tax shelter arrangements because such arrangements are designed to generate artificial tax losses from foreign currency options transactions.[21]  IRS Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis," alerted taxpayers that the so-called "Son of BOSS scheme" had been "'listed' as an abusive tax shelter."[22] "Although there are several variants of the Son of BOSS tax shelter[,] . . . they all rely on the same common principles.  'Son of BOSS' uses a series of contrived steps in a partnership interest to generate artificial tax losses designed to offset income from other transactions."[23]

As this Court recently explained, the "classic Son of BOSS shelter[s] . . . create[] tax benefits in the form of deductible losses or reduced gains by creating an artificially high basis in partnership interests.  Ordinarily under the Internal Revenue Code, when a partner contributes property to a partnership, the partner's basis in his partnership interest increases.  When a partnership assumes a partner's liability, the partner's basis decreases.  The Son of BOSS shelter recognizes the increased basis resulting from the partnership's

---

plan, as executed through the three-tiered partnerships with the attendant steps, was not interrelated with . . . Williams' subsequent investment activity with Bricolage.  Instead, . . . the F[OC]us steps and the subsequent investment activity with Bricolage were separate events, not dependent upon each other, and neither requiring the other to proceed.").

[21] *Id.*; *see Kornman*, 527 F.3d at 446 n.2 (describing the "BOSS" and "Son of BOSS" shelters).

[22] *Kornman*, 527 F.3d at 446 n.2.  "'BOSS' is an acronym for 'Bond and Option Sales Strategy[.]'" *Id.*

[23] *Id.* (citations and internal quotation marks omitted).

acquisition of the partner's asset, but ignores the effect on that basis created by the partnership's assumption of the partner's liability. A higher basis can lead to the recognition of a loss or a reduced amount of gain when the asset is sold."[24] Due to these features, Son of BOSS is a well-recognized "abusive" tax shelter.[25]

On April 21, 2002, the IRS compelled KPMG to disclose all information about and all persons participating in FOCus programs. Then, on June 27, 2002, the IRS issued Notice 2002-50, entitled "Partnership Straddle Tax Shelter." The notice "advise[d] taxpayers and their representatives that the described transaction, which uses a straddle, a tiered partnership, a transitory partner and the absence of a section 754 election to obtain a permanent non-economic loss, is subject to challenge by the Service on several grounds. The notice holds that the described transaction is now a 'listed transaction' and warns of the potential penalties that may be imposed if taxpayers claim losses from such a transaction," and that the transactions will be disregarded if they lack "economic substance." Notice 2002-50, 2002-28 I.R.B. 98, 2002-2 C.B. 98.

On October 11, 2002, several months after Notice 2002-50 was issued, Arnold & Porter sent Carson and Williams the "more likely than not" legal opinion letters as stipulated in the KPMG PowerPoint presentation promoting the FOCus program and investment package.[26] The letter addressed to Williams stated that, in the firm's "opinion, it is more likely than not that the series of transactions analyzed in this opinion are the same as, or substantially similar

---

[24] *Bemont Invs., L.L.C. ex rel. Tax Matters Partner v. United States*, 679 F.3d 339, 341-42 (5th Cir. 2012) (citing 26 U.S.C. §§ 722, 752).

[25] *See id.* at 342, 344 (citing IRS Notice 2000-44, 2000-36 I.R.B. 255, 2000-2 C.B. 255 (Sept. 5, 2000)); *Kornman*, 527 F.3d at 446 n.2.

[26] One letter was addressed to Carson Partners Fund, LLC, and the other was addressed to Williams as Trustee for the Williams Trust. The salutation in both letters was directed to "Mr. Williams," and both letters sent in care of Williams' attorney at Baker Donelson.

to, the listed transaction described in Notice 2002-50." Nonetheless, the Arnold & Porter tax opinions do not attempt to distinguish the FOCus transactions from those described by Notice 2002-50 or to address how the Notice could affect a court's analysis of the transactions. The letter simply recommended that the transactions described in the letter "more likely than not" had economic substance. The partnerships filed their eleven Form 1065 partnership information returns between March and October of 2002 reporting the embedded loss from the sale of Reno.[27] On October 15, 2002, Williams filed his individual tax return claiming the deduction for the embedded loss.[28]

In 2006, the IRS issued FPAA notices pursuant to 26 U.S.C. § 6223 for each of eleven separate partnership tax returns for the corporate tax periods ending in November through December of 2001.[29] Those FPAAs asserted that the FOCus program transactions were a sham intended to generate a tax loss for Williams:

> Nevada Partners Fund, LLC . . . was formed and availed of solely for purposes of tax avoidance and, in furtherance of such purpose, engaged in a prearranged transaction, designed and executed through a series of meaningless steps, using a straddle, a tiered partnership structure, a transitory partner, and the absence of a Section 754 election to allow a tax shelter investor to claim a permanent non-economic loss. . . . [T]he series of steps comprising the Transaction, including the creation of [Nevada, Carson, and Reno,] . . . and the purchase and sale of foreign currency contracts and positions was a sham, lacked economic substance, and was not engaged in for a legitimate business purpose.

---

[27] Three of the partnerships' 1065 Forms were marked received by the IRS on March 18, 2002; three were marked received on April 17, 2002; and the remaining five were marked received between October 18 and 21, 2002.

[28] As of December 31, 2004, Sapphire II, a Mississippi corporation owned by Williams and his two brothers, purchased Bricolage's interest in Nevada and Carson and replaced Bricolage as the Administrative Member. Accordingly, Sapphire II is a named party to this appeal, but that transaction is not at issue in the case.

[29] *Bemont*, 679 F.3d at 340 ("An FPAA is the partnership equivalent of a statutory notice of deficiency to an individual or non-partnership entity.").

No. 10-60559

Accordingly, the FPAAs disallowed the losses claimed by the partnerships and, in turn, by Williams, under the economic substance doctrine, which, in short, "allows courts to enforce the legislative purpose of the [Internal Revenue] Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality."[30]

In the alternative, the IRS asserted that under Treasury Regulation § 1.701-2, it could shift the $18 million gain from the Reno foreign exchange straddle transactions, which were realized in November before Williams was a partner, to Williams individually. The FPAAs also assessed three alternative penalties under 26 U.S.C. § 6662: one for negligence and one for substantial understatement, both of which carried a 20% penalty based on the underpayment; and a third for gross valuation misstatement, which carried a 40% penalty.

## C.  *District Court Proceedings*

The plaintiffs filed eleven actions in the United States District Court for the Southern District of Mississippi challenging each FPAA and penalty. The cases were consolidated and tried in a bench trial. The district court heard testimony from numerous witnesses over several weeks, and in a seventy eight-page memorandum opinion and order dated April 30, 2010, the district court upheld the adjustments and two of the three penalties asserted in the FPAAs. The court concluded that the multi-step FOCus program lacked economic substance and was intended only to provide Williams with a tax shelter. The court also upheld the IRS's reliance on Treasury Regulation § 1.701-2 as authority to attribute the relevant tax-related transactions to Williams. With regard to the penalties, the court upheld the negligence and substantial

---

[30] *Klamath*, 568 F.3d at 543.

understatement penalties (while recognizing that these penalties were not cumulative, i.e., they could not be "stacked") and rejected the plaintiffs' substantial authority and reasonable cause defenses. However, the court disallowed the 40% valuation misstatement penalty, citing this Court's *Todd–Heasley* rule disallowing that penalty where the relevant deduction has been totally disregarded because the underlying transaction lacked economic substance.[31] The district court entered judgment sustaining the IRS's position in each of the eleven FPAAs but disallowing the 40% penalty.

The plaintiffs moved to amend the district court's judgment to reflect a dismissal of their claims as to only eight of the eleven FPAAs. They argued that the judgment, as entered, effectively imposed a double tax because eight of the FPAAs disallowed the losses as lacking in economic substance, while the remaining three FPAAs would have held Williams responsible for the gains. The plaintiffs argued that judgment in the actions challenging the three "gain" FPAAs should be rendered in their favor because they were premised on the IRS's alternative argument—namely, that, if the transactions did have economic substance, then the partnerships' gains on the transactions should be reallocated to Williams and taxed even though they fell outside the period in which he had an ownership interest in the partnerships, pursuant to the Treasury Regulations' "anti-abuse rule."[32] The government opposed the motion on procedural grounds but conceded that in substance it did not seek to collect taxes from the partnerships on both its principal theory (lack of economic substance) and its alternative theory (Treasury Regulation § 1.701-2). The district court

---

[31] *See Heasley v. Comm'r*, 902 F.2d 380, 383 (5th Cir. 1990); *Todd v. Comm'r*, 862 F.2d 540, 542-44 (5th Cir. 1988).

[32] *See* 26 C.F.R. § 1.701–2 (anti-abuse rule).

No. 10-60559

denied the motion. The partnerships timely appealed,[33] and the government cross-appealed the district court's denial of a larger penalty.[34]

## II.

### A.  *Economic Substance Doctrine*[35]

Our economic substance analysis begins with *Gregory v. Helvering*, 293 U.S. 465 (1935), "the Supreme Court's foundational exposition of economic substance principles under the Internal Revenue Code." *ACM P'ship v. Comm'r*,157 F.3d 231, 246 (3d Cir. 1998). In *Gregory*, the taxpayer engaged in a series of transactions which were technically consistent with the Internal Revenue Code but which lacked any real economic substance and defeated the purpose of the Code provisions. 293 U.S. at 467-70. The taxpayer attempted to avoid paying taxable dividends on stock transfers from her wholly-owned corporation by first creating a new corporation to which she transferred the stock, and then liquidating the new corporation and transferring the stock to herself. *Id.* at 467-68. She claimed that the transaction did not create taxable

---

[33] *See* 26 U.S.C. § 6226(b)(1); Fed. R. App. P. 4(a)(4)(A)(iv).

[34] Jurisdiction was proper in the district court pursuant to 28 U.S.C. § 1346(e). Jurisdiction to review partnership proceedings is limited to the determination of partnership items, as well as penalties and defenses asserted on behalf of the partnership. *See* 26 U.S.C. §§ 6221, 6226(f); *Klamath*, 568 F.3d at 547-48. We have jurisdiction to review the final judgment of the district court. *See* 26 U.S.C. § 6226(g); 28 U.S.C. § 1291.

[35] Subsequent to the events giving rise to this lawsuit, Congress passed a law codifying the economic substance doctrine, which became effective after the district court issued its opinion in this case. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152 § 1409, at *1067-68, *codified at* 26 U.S.C. § 7701(o) ("Clarification of economic substance doctrine."). The Act also effected numerous other changes, including to the application of the gross valuation misstatement penalty and the reasonable cause defense. *See generally id.* at *1067-70. The 2010 amendments apply "to transactions entered into after the date of the enactment of th[e] Act," on December 17, 2010. *Id.* at *1070. No one contends that the revisions apply in this case, and we do not consider them.

No. 10-60559

dividends because she had received the stock "'in pursuance of a plan of reorganization'" within the meaning of the Internal Revenue Code. *Id.* at 468-69 (citation omitted). Although the transactions technically fell within the definition of a corporate reorganization, which normally would have meant that the transfers were exempt from taxation, the Court held that the IRS could collect tax on the dividends. *Id.* at 469-70. The Court explained that "[t]he whole undertaking, though conducted according to the terms [of the statute], was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization" and as such it defeated the "plain intent" of the Internal Revenue Code. *Id.* at 470. Therefore, pursuant to *Gregory*, to determine whether a claimed deduction "exalt[s] artifice above reality," *id.*, we "'look beyond the form of [a] transaction' to determine whether it has the 'economic substance that its form represents,'" *ACM P'ship*, 157 F.3d at 247 (citation and alteration omitted); *accord Freytag v. Comm'r*, 904 F.2d 1011, 1015 (5th Cir. 1990) ("The fundamental premise underlying the Internal Revenue Code is that taxation is based upon a transaction's substance rather than its form. Thus sham transactions are not recognized for tax purposes, and losses allegedly generated by such transactions are not deductible."), *aff'd on other grounds*, 501 U.S. 868 (1991).

The Supreme Court has explained that a "natural conclusion" of its holding in *Gregory* was that transactions that "do not vary control or change the flow of economic benefits[ ] are to be dismissed from consideration." *Higgins v. Smith*, 308 U.S. 473, 476 (1940); *accord Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006). This Court, the Federal Circuit, and other Courts of Appeals have followed a similar approach. *See Klamath*, 568 F.3d at 543.[36] In *Klamath*, we observed that a split existed among other circuits

---

[36] *Accord, e.g., Coltec*, 454 F.3d at 1353-54 (Federal Circuit); *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006); *Boca Investerings P'ship v. United States*, 314 F.3d

regarding when a transaction should be disregarded as lacking economic reality. *See id.* We did not follow the Fourth Circuit's "rigid two-prong test, where a transaction will only be invalidated if it lacks economic substance *and* the taxpayer's sole motive is tax avoidance." *Id.* at 544 (citing *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91-92 (4th Cir. 1985)) (emphasis added). Instead, we adopted the majority view, which "is that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance." *Id.* (citations omitted). We concluded that the majority view more accurately interprets the Supreme Court's prescript in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), which addressed the factors courts should consider when assessing whether a transaction lacks economic substance. *Klamath*, 568 F.3d at 544.

We derived from *Frank Lyon* a "multi-factor test for when a transaction must be honored as legitimate for tax purposes," including whether the transaction: "(1) has economic substance compelled by business or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax-avoidance features." *Klamath*, 568 F.3d at 544. "In other words, the transaction must exhibit objective economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance." *Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 480 (5th Cir. 2011). "Importantly, these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes. Thus, if a transaction lacks economic substance compelled by business or regulatory realities, the transaction must be disregarded even if the taxpayers profess a genuine business purpose without tax-avoidance motivations." *Klamath*, 568 F.3d at

---

625, 631 (D.C. Cir. 2003); *In re CM Holdings, Inc.*, 301 F.3d 96, 102 (3d Cir. 2002); *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001).

544. "While 'these factors are phrased in the conjunctive,['] . . . there is near-total overlap between the latter two factors. To say that a transaction is shaped totally by tax-avoidance features is, in essence, to say that the transaction is imbued solely with tax-dependent considerations." *Southgate*, 659 F.3d at 480 & n.40 (quoting *Klamath*, 568 F.3d at 544).

"[W]hen applying the economic substance doctrine, the proper focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions that do not produce tax benefits." *Klamath*, 568 F.3d at 545. "As to the first *Klamath* factor, transactions lack objective economic reality if they 'do not vary, control, or change the flow of economic benefits.'" *Southgate*, 659 F.3d at 481 (citation and alteration omitted). "The objective economic substance inquiry asks whether the transaction affected the taxpayer's financial position in any way." *Id.* at 481 n.41 (citation, quotation marks, and alterations omitted). "This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so[,]" meaning "'a reasonable possibility of profit from the transaction existed apart from tax benefits.'" *Id.* at 481 & n.43 (citation and other footnote omitted). "That inquiry must be 'conducted from the vantage point of the taxpayer at the time the transactions occurred, rather than with the benefit of hindsight.'" *Id.* at 481 (citation omitted).

When considering whether a transaction lacks economic substance and thus should be disregarded for tax purposes, courts have given close scrutiny to arrangements with subsidiaries that do not affect the economic interest of independent third parties. *See Southgate*, 659 F.3d at 481 n.42 ("A circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes.") (citation, quotation marks, and alteration omitted); *see also, e.g.*, *Frank Lyon*, 435 U.S. at 575, 583 (holding that a "genuine multiple-party transaction" had economic substance, and distinguishing more

"familial" arrangements involving only two parties); *Gregory*, 293 U.S. at 469 (concluding that the transfer of stock from a wholly owned corporation to a newly created corporation, and then directly to the taxpayer, lacked economic substance because the "sole object and accomplishment of [the transfer] was the consummation of a preconceived plan, not to reorganize a business . . . but to transfer a parcel of corporate shares to the petitioner"); *Coltec*, 454 F.3d at 1360 ("[T]he transaction here could only affect relations among Coltec and its own subsidiaries—it has absolutely no [e]ffect on third party . . . claimants."); *United Parcel Serv. of Am.*, 254 F.3d at 1018-19 (concluding that a transaction had economic substance because it created "genuine obligations enforceable by an unrelated party" that was not under the taxpayer's control).

Finally, the Supreme Court has noted that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (citations omitted); *accord, e.g.*, *Arevalo v. Comm'r*, 469 F.3d 436, 440 (5th Cir. 2006). Accordingly, "when [a] taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance." *Coltec*, 454 F.3d at 1355. A notice of deficiency issued by the IRS is "generally given a presumption of correctness, which operates to place on the taxpayer the burden of producing evidence showing that the Commissioner's determination is incorrect." *Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 387 (5th Cir. 1995).

No. 10-60559

## B.    *Economic Substance Vel Non of the FOCus Transactions*

The district court's ultimate conclusion as to whether a transaction has economic substance is a question of law we review de novo, but we review the particular facts from which that characterization is made for clear error. *Southgate*, 659 F.3d at 480; *Klamath*, 568 F.3d at 543. Measured by these standards, we see no error of law or clear error of fact in the district court's decision.

Applying the foregoing economic substance doctrine principles, we conclude that the district court did not err legally or factually in determining that the partnerships failed to meet their burden of proving that the transactions giving rise to the $18 million tax loss in question had economic substance. The district court correctly held that the multi-step FOCus strategy carried out in conjunction with the three-tiered partnership structure of Nevada, Carson, and Reno between October and December of 2001 lacked economic substance and served no other purpose than to provide the structure through which Williams could enjoy the reduction of his tax burden for that year. Accordingly, the district court correctly concluded that the FOCus transactions must be disregarded for tax purposes, and that in their absence the $18 million embedded loss in Reno and Carson was correctly disallowed by the IRS. The district court in making these determinations correctly analyzed the FOCus transactions that gave rise to the tax benefit at issue and correctly rejected the partnerships' argument that the court should consider the FOCus transactions as part of Williams' subsequent, highly profitable investments with Bricolage from mid-2002 through 2007.

The record shows that the 2001 Reno foreign currency straddles, the pre-March 2002 Carson Yen carry trades, and Williams' personal guarantee of the Credit Suisse loan to Carson, viewed objectively, were not designed to make a profit, but were used to create an $18 million loss; to separate the gains from

23

that loss by allocating the gains to the transitory owners of Carson, to embed the loss on Carson's books; to allow Williams to acquire Carson along with its embedded $18 million loss; and ultimately to allow him to acquire, by his loan guarantee, the rest of his $18 million basis in Carson that he needed to claim the loss as a deduction against his unrelated $18 million personal capital gain.[37] Altogether, those were the transactions that enabled Williams with some plausibility to claim Carson's embedded loss of $18 million as a deduction on his individual 2001 income tax return. None of those key transactions had economic substance because they were designed to serve no other purpose than to provide the structure through which Williams could enjoy the $18 million reduction of his personal 2001 tax burden.

Further, the key FOCus transactions were conducted among several related entities and even the trades with third persons were engineered to avoid producing any meaningful profits or losses apart from the artificial loss embedded in Reno and Carson that gave rise to Williams' tax benefit. *See, e.g.*, *Southgate*, 659 F.3d at 481 n.42 ("A circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes.") (citation, quotation marks, and alteration omitted); *Frank Lyon*, 435 U.S. at 575 (suggesting that "familial" arrangements, in contrast with "genuine multiple-party transaction[s]," are more likely to lack economic substance); *Coltec*, 454 F.3d at 1360 (concluding transaction that had "absolutely no [e]ffect on third party . . . claimants" lacked economic substance).

We agree with the district court's assessment, based in part on the persuasive testimony of the government's expert, Dr. Timothy Weithers, that the

---

[37] As noted above, *supra* n.15, according to the FOCus program, a capital commitment of fifty percent of the desired loss was necessary to avoid then-applicable tax-shelter registration requirements. *See* 26 U.S.C. § 6111(a), (c) (2000). Accordingly, half of Williams' basis was created by his capital investment in Carson, and the rest of Williams' basis was created by his unsolicited guarantee of the $9 million loan to Carson.

No. 10-60559

2001 Reno straddle trades had no objective possibility of making a meaningful overall profit or of appreciably affecting the beneficial interest—aside from tax avoidance—of either Williams or the partnerships. The straddles produced almost precisely offsetting gains and losses; as Weithers explained, those trades "involved little or no real market exposure, with virtually no likelihood of generating significant positive or negative returns." Reno and Credit Suisse followed a plan calculated to ensure those closely offsetting results by invariably unwinding each straddle within one or two business days, and with the same exchange rate exposure, to lock in the virtually offsetting gains and losses that typically result from exchange rate fluctuations within such short periods.

The partnerships argue that straddle trades are often used to make a profit, citing the report and testimony of their expert witness. The partnerships contend that an investor could reasonably profit after having bought both an option to purchase (a "call") and an option to sell (a "put") in the same commodity or currency by exercising whichever of the two would generate a higher net gain. Indeed, both parties' experts recognized that straddle trades are a relatively common investment strategy and can in theory generate a profit.[38] However, the Reno straddle trades, as designed and carried out, simply could not produce

_____

[38] A straddle creates a potential for profit as follows: If the commodity increases in price beyond the strike price of the buy option or call, the buyer can exercise the call and reap the net gain between the strike price and the actual price of the commodity. The investor makes a profit where this net gain is more than the amount he or she paid for the options to buy and sell. Conversely, if the commodity price decreases below the strike price for the sell option or put, the investor can exercise the put, and sell the commodity at the strike price, which is then above the actual price of the commodity. Again, the investor is rewarded with the net gain between the actual and strike prices, and if that gain is more than he paid for the options, the investor makes a profit. Thus, a straddle rewards the investor only when the commodity fluctuates enough in price, either up or down, to make the net gain on the call or the put option more than the cost of the options. In the present case, however, the strategy called for the exercise of both the call and the put, and within such short periods as to produce virtually offsetting gains and losses. *See generally, e.g.*, *Freytag*, 904 F.2d at 1013 n.1; *Miller v. Comm'r*, 836 F.2d 1274, 1276-77 (10th Cir. 1988); *Yosha v. Comm'r*, 861 F.2d 494, 495-97 (7th Cir. 1988).

a profit; they were calculated and managed to produce offsetting gains and losses. Rather than choosing and timing the exercise of the more profitable leg of each trade, or by purchasing options that hedged meaningfully different positions in the same currency over time, the FOCus strategy was to exercise both the call and the put within at most a two-day period using options with the same market exposure rate, which generated virtually equal-and-opposite gains and losses within a short period. *Cf. United States v. Atkins*, 869 F.2d 135, 137-38 (2d Cir. 1989) (affirming criminal convictions for wilful tax evasion of traders who engaged in straddle trades engineered to avoid the possibility of any risks or gains due to market fluctuations and created for the sole purpose of generating artificial tax-deductible losses for their clients). As this Court explained in *Klamath*, the theoretical possibility for profit in a particular type of transaction is beside the point when the transaction—as it was actually carried out—lacked such a possibility. *See* 568 F.3d at 545. By the time Williams invested in the FOCus partnerships, the gains from the Reno straddle trades had already been absorbed by Carson's transitory owners, and all that remained from the straddle trades was the equal and opposite multi-million dollar loss on Reno's, and then Carson's, books. Williams was simply allowed, for a fee, to purchase a partnership holding a large tax loss for use as a deduction against his unrelated income. There was no possibility of net profit in the Reno straddle transactions.

Likewise, Williams' personal guarantee of Credit Suisse's $9 million loan to Carson had no economic substance. The personal guarantee was not required by the bank as a condition of the loan and did not further any non-tax related business objective of Williams or the partnerships. It was essentially gratuitous and designed only to increase Williams' tax basis in Carson so that he could claim Carson's embedded loss as a deduction. In sum, the transactions that created Carson's $18 million embedded loss had no economic substance and

No. 10-60559

Williams obtained the benefit of an $18 million deduction on his 2001 personal income tax return without suffering any real economic loss.

The partnerships also argue that the Carson Yen carry trade maturing in March of 2002 had economic substance because it ended with a slight credit balance of approximately $51,000. This argument is without merit for several reasons. First, the tax benefit claimed by Williams stemmed from the Reno straddle trades, not from the Carson Yen carry trade. *See Klamath*, 568 F.3d at 545 ("[W]hen applying the economic substance doctrine, the proper focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions that do not produce tax benefits.") The particular transactions that gave rise to the tax loss benefit were generated by the Reno straddle trades, not the Carson Yen carry trade. Because the straddle transactions lacked economic substance, the $18 million artificial loss must be disregarded for tax purposes regardless of whether Carson's March 2002 Yen carry trade was entered into for profit.

Moreover, the record supports the district court's conclusion that the Carson Yen trade was by design not entered into for profit, either. In the Yen transaction, Carson limited its exposure to exchange-rate fluctuations by means of a narrow risk "collar," which ensured that Carson stood to gain at most $77,000 or to lose at most $90,000—by design a relatively insignificant range in comparison with the $18 million tax benefit, the $9 million loan used for the trades, and the substantial fees and expenses incurred in the course of the FOCus program.[39] As the Supreme Court has put it in a comparable situation, it was a "relative pittance" that did "'not appreciably affect [the] beneficial

---

[39] The fees and transactional expenses included, for example, Bricolage's fee ($845,000), Arnold & Porter's fee ($100,000), KPMG's fee ($225,000), collateral for the Yen trade ($90,000), the cost of buying the LLCs, transactional costs associated with selling Reno, trade commissions, and personnel costs. *See supra* n.19.

interest[.]'" *Knetsch v. United States*, 364 U.S. 361, 366 (1960) (quoting *Gilbert v. Comm'r*, 248 F.2d 399, 411 (2d Cir. 1957) (Learned Hand, J., dissenting)); *accord, e.g.*, *Keeler v. Comm'r*, 243 F.3d 1212, 1214-15 (10th Cir. 2001) (concluding a taxpayer's "straddle" trades of stock positions lacked economic substance because the "trading program" offered "only illusory opportunity for economic profit" and any potential profit was "anemic beside [the] considerable capacity for tax gaming"). We agree that the purpose of the collared transaction was not to make a profit but to "mak[e] Carson and Nevada appear gainfully employed," *Nevada Partners*, 714 F. Supp. 2d at 632, while generating the embedded loss and providing a pretext for Williams to increase his basis in Carson (through his gratuitous personal guarantee of the loan) so that he could take full advantage of the embedded loss. The $51,000 amount gained in this transaction was not shown to have been a net profit on an investment but rather was within the range of operational expenses or gains assumed as a byproduct of the design of the transactions, which, viewed objectively, were prearranged so as to avoid undertaking a meaningful risk or realizing a meaningful net profit or loss.

Finally, the partnerships contend that the transactions had economic substance because the FOCus program represented the preliminary stage of an integrated long-term investment program by Williams with Bricolage that ultimately earned Williams $8 million from Yen carry trades from March 2002 forward, and $23 million from other types of investments from mid 2002 to 2007. As the district court reasonably found, however, the transactions giving rise to the tax loss benefit, the 2001 Reno straddle trades, were distinct from the subsequent profitable investments from March 2002 forward. Correspondingly, the highly profitable investments by the Williams family with Bricolage from mid 2002 to 2007 did not give rise to the 2001 tax loss at issue in this case. Thus, the district court did not err in finding that the FOCus artificial

No. 10-60559

loss-creation plan simply was not "interrelated with" the subsequent for-profit investment activity; instead, they were "separate events, not dependent upon each other, and neither requiring the other to proceed." *Nevada Partners*, 714 F. Supp. 2d at 633; *see Sala v. United States*, 613 F.3d 1249, 1250, 1252-54 (10th Cir. 2010) (holding that the IRS properly disallowed deductions due to their lack of economic substance where the taxpayer participated in "an investment program that included an initial phase designed primarily to generate a tax loss so as to offset" otherwise taxable income and the transactions giving rise to the tax benefit were separable from the follow-on investment plan), *cert. denied*, 132 S. Ct. 91 (2011).

The record as a whole supports the district court's factual findings, and the plaintiffs do not present a cogent reason why we should be left with a firm and definite conviction that a mistake has been made. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). For these reasons, we conclude that the district court did not err in deciding that the partnerships did not carry their burden of proving that the transactions that gave rise to the tax loss in question had economic substance.[40]

## III.

Finally, having decided that the FOCus transactions must be disregarded for federal income tax purposes, we have jurisdiction to review the district court's determinations regarding the penalties assessed against the partnerships

---

[40] Because we conclude that the transactions lacked economic substance under the objective prong of the *Klamath* inquiry, we need not and do not also consider whether the transactions had subjectively "genuine business purpose without tax-avoidance motivations." *Klamath*, 568 F.3d at 544. As discussed above, the objective and subjective factors are conjunctive, "meaning that the absence of any one of them will render the transaction void for tax purposes." *Id.*; *accord Southgate*, 659 F.3d at 480.

No. 10-60559

by the IRS. *See Klamath*, 568 F.3d at 547-48; 26 U.S.C. § 6226(f); *accord Am. Boat Co., LLC v. United States*, 583 F.3d 471, 478 (7th Cir. 2009).

Section 6662 of the Internal Revenue Code in effect in 2001 authorizes the IRS to levy a penalty equal to 20% of the portion of any underpayment of tax attributable to, *inter alia*, the following: (i) negligence or disregard of rules or regulations; (ii) substantial understatement of income tax; and (iii) substantial valuation misstatement.[41] The IRS assessed a penalty against the partnerships under each of these three provisions. However, because penalties under § 6662 must be applied alternatively, not cumulatively, only one of the penalties assessed may be sustained—they cannot be stacked. *See Southgate*, 659 F.3d at 492 n.81; *Bemont*, 679 F.3d at 346.

The district court reversed the penalty for substantial valuation misstatement in accord with our decisions in *Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988) and *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990), holding that a valuation misstatement penalty is not applicable where an entire transaction is disregarded under the economic substance doctrine. Because this panel, like the district court, is bound by our circuit precedents in *Todd* and *Heasley*,[42] we will affirm the district court's judgment in this respect without added discussion here. For the reasons hereinafter assigned, we conclude that the negligence penalty was correctly assessed and affirmed by the district court.

---

[41] The valuation-misstatement penalty authorized increases to 40% in the case of a gross valuation misstatement. 26 U.S.C. §§ 6662(e)(1)(B)(i), 6662(h)(1)-(h)(2)(A)(ii) (2000).

[42] *See Bemont*, 679 F.3d at 351-55 (Prado, J., specially concurring, joined by Reavley & Davis, JJ.) (same); *see also Hill v. Carroll Cnty.*, 587 F.3d 230, 237 (5th Cir. 2009) ("[A] later panel of this court cannot overrule an earlier panel decision."). Although the Supreme Court has granted certiorari in *Woods v. United States*, 471 F. App'x 320 (5th Cir. 2012) (addressing the application of the 40% penalty and this Court's *Todd–Heasley* rule), *see Woods v. United States*, No. 12-562, 2013 WL 1187584 (Mar. 25, 2013), "[a]bsent an intervening Supreme Court case overruling prior precedent, we remain bound to follow our precedent even when the Supreme Court grants certiorari on an issue[,]" *United States v. Lopez–Velasquez*, 526 F.3d 804, 808 n.1 (5th Cir. 2008).

Because but one 20% penalty may stand, we will affirm the district court's approval of the negligence penalty and vacate its approval of the substantial understatement of income tax penalty without needless discussion of that alternate basis for the penalty.

### A.    The Partnerships' Negligence

We review a lower court's "findings of negligence under the clearly erroneous rule." *Streber v. Comm'r*, 138 F.3d 216, 219 (5th Cir. 1998); *accord, e.g.*, *Masat v. Comm'r*, 784 F.2d 573, 577 (5th Cir. 1986). "Clear error exists when this court is left with the definite and firm conviction that a mistake has been made." *Streber*, 138 F.3d at 219. "The taxpayer bears the burden of establishing the absence of negligence." *Reser v. Comm'r*, 112 F.3d 1258, 1271 (5th Cir. 1997); *accord, e.g.*, *Zmuda v. Comm'r*, 731 F.2d 1417, 1422 (9th Cir. 1984) ("The taxpayer has the burden of establishing that the penalty was erroneous."); *see also, e.g.*, *INDOPCO, Inc.*, 503 U.S. at 84 ("[T]he burden of clearly showing the right to the claimed deduction is on the taxpayer."); *Arevalo*, 469 F.3d at 440 ("Taxpayers bear the burden of proving their entitlement to deductions.").

Section 6662 of the Internal Revenue Code imposes the 20% penalty attributable to "[n]egligence or disregard of rules or regulations." 26 U.S.C. § 6662(b)(1). "Negligence" can include any failure to make a reasonable attempt to comply with the provisions of the Code, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly. 26 U.S.C. § 6662(c); 26 C.F.R. § 1.6662-3(b)(1). Negligence for this purpose is defined by the "reasonable and prudent person" standard. 26 C.F.R. § 1.6662-3(b)(1)(ii); *Bemont*, 679 F.3d at 348; *accord, e.g.*, *Sandvall v. Comm'r*, 898 F.2d 455, 458 (5th Cir. 1990) (applying standard to prior version of statute); *Marcello v. Comm'r*, 380 F.2d 499 (5th Cir. 1967)

## No. 10-60559

(same). "Generally speaking, the negligence standard as in the tort context is objective, requiring a finding of a lack of due care or a failure to do what a reasonable and prudent person would do under analogous circumstances." *See, e.g.*, *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 233 (3d Cir. 2002) (citing *Schrum v. Comm'r*, 33 F.3d 426, 437 (4th Cir. 1994)).

On the basis of the record, the district court was justified in concluding as a matter of fact that the partnerships were negligent and exposed themselves to liability for the § 6662 accuracy-related penalties because they did not meet their burden of proving due care and the absence of negligence. *See Goldman v. Comm'r*, 39 F.3d 402, 407 (2d Cir. 1994) ("Once the Commissioner determines that a negligence penalty is appropriate, the taxpayer bears the burden of establishing the absence of negligence."). The evidence supports the district court's findings that the persons acting in behalf of the partnerships knew that their 2001 FOCus transactions lacked economic substance and would create an artificial loss that would later be used by Williams, who suffered no matching economic loss, to take a "too good to be true"[43] $18 million deduction against his unrelated 2001 personal capital gain of the same amount. *See Neonatology Assocs.*, 299 F.3d at 234 ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."). The partnerships did not introduce any evidence to prove that, before they engaged in the FOCus transactions between November and December 2001, they made a proper investigation or exercised due diligence to verify the tax legitimacy of the proposed FOCus transactions at issue.

---

[43] 26 C.F.R. § 1.6662-3(b)(1)(ii) ("Negligence is strongly indicated where . . . [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances.").

No. 10-60559

Further, the persons involved in promoting and setting up the partnerships' 2001 FOCus transactions were experienced investors who proceeded with their plans to create an artificial tax loss for the benefit of Williams or other Bricolage clients, despite clear warning against "Partnership Straddle Tax Shelter[s]" by IRS Notice 2002-50, 2002-28 I.R.B. 98.[44]　The plaintiffs were negligent for failing "to make a reasonable attempt to comply with the provisions of this title[,]" 26 U.S.C. § 6662(c), which the Treasury Regulations define to include "revenue rulings or notices . . . issued by the Internal Revenue Service and published in the Internal Revenue Bulletin[,]" 26 C.F.R. § 1.6662-3(b)(2).　After the notice issued, the partnerships were negligent in proceeding with the FOCus program, including filing partnership tax returns reflecting the FOCus transactions.　The Notice specifically warned that penalties could result from what the partnerships planned and executed, *viz.*, "prearrange[d] . . . use of a straddle, a tiered partnership, a transitory partner" to obtain a "permanent non-economic loss" from transactions lacking in "economic substance." *Id.* Consequently, the district court did not err in finding that the partnerships failed to prove that they acted with due care and with proper regard for the rules and regulations, and that they therefore exposed themselves to the 20% negligence penalty.[45]　Because the partnerships claim

---

[44] The partnerships were also on notice that similar partnership arrangements, Son of BOSS transactions, were considered to be abusive tax shelters by the IRS.　*See* I.R.S. Notice 2000-44 ("Tax Avoidance using Artificially High Basis," published September 2000).

[45] A notice is akin to a "revenue ruling" and is an interpretation of the law offered by the IRS.　While not binding precedent, revenue rulings—and notices—are entitled to "special" or "respectful consideration" and are "to be given weight as expressing the studied view of the agency whose duty it is to carry out the statute." *Foil v. Comm'r*, 920 F.2d 1196, 1201 (5th Cir. 1990); *see also* 26 C.F.R. § 601.201(a)(6) (defining revenue rulings); *cf.* 26 C.F.R. § 1.6662-3(c)(1) (setting out procedures for bringing "good faith challenge[s] to the validity of" IRS notices and regulations contrary to the taxpayer's position).

33

that they are entitled to the reasonable cause and good faith defense, however, we now turn to that subject.

## B.    *The Reasonable Cause and Good Faith Defense*

Section 6664(c)(1) provides a narrow defense to § 6662 penalties if the taxpayer proves it had (1) reasonable cause for the underpayment and (2) acted in good faith.

First, the partnerships contend that in, making the 2001 FOCus transactions, they were entitled to reasonably rely on what they claim to be relevant authority, *viz.*, *Compaq Computer Corp. & Subsidiaries v. Commissioner*, 277 F.3d 778, 786 (5th Cir. 2001), *UPS of America, Inc. v. Commissioner*, 254 F.3d 1014, 1018 (5th Cir. 2001), and *IES Industries, Inc. v. United States*, 253 F.3d 350, 354 (8th Cir. 2001).  We disagree.  These cases are not apposite here.  In each of them, the court concluded that the transaction challenged by the IRS had economic substance because it involved a reasonable possibility of significant profit or loss.  *See Compaq*, 277 F.3d at 786 ("Compaq's U.S. tax on that net pre-tax profit was roughly $644,000.  Subtracting $644,000 from the $1.894 million results in an after-tax profit of about $1.25 million.  The transaction had economic substance."); *IES*, 253 F.3d at 354 ("The foreign corporation's withholding and payment of the tax on IES's behalf is no different from an employer withholding and paying to the government income taxes for an employee: the full amount before taxes are paid is considered income to the employee.  Because the entire amount of the ADR dividends was income to IES, the ADR transactions resulted in a profit, an economic benefit to IES." (citation omitted)).  In *UPS*, perhaps the most dissimilar case, because it involved an ongoing legitimate business rather than a tax shelter,  the court held that the taxpayer's restructuring of its excess-value program as insurance provided by an overseas affiliate had real economic substance in addition to tax benefits, and

so was not a sham transaction. 254 F.3d at 1018 ("The kind of 'economic effects' required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party. . . . The restructuring of UPS's excess-value business generated just such obligations. There was a real insurance policy between UPS and National Union that gave National Union the right to receive the excess-value charges that UPS collected. And even if the odds of losing money on the policy were slim, National Union had assumed liability for the losses of UPS's excess-value shippers, again a genuine obligation. . . . Nor did the reinsurance treaty with OPL, while certainly reducing the odds of loss, completely foreclose the risk of loss because reinsurance treaties, like all agreements, are susceptible to default."). In the present case, dissimilar to the situations in *Compaq*, *IES*, and *UPS*, the district court found after a lengthy bench trial that the 2001 FOCus transactions by the partnerships were part of a sham tax shelter and lacked economic substance because none of the challenged transactions presented a reasonable possibility of significant profit or loss, or created reciprocal obligations with an unrelated party that affected the partnerships' economic interest, and we have affirmed those findings as being reasonable and not clearly erroneous.

Next, the partnerships argue that their negligence should have been excused because Williams, who ultimately became their "controlling member," acted for them in relying on the advice of professionals. While it is true that actual reliance on the tax advice of an independent, competent professional may negate a finding of negligence, *see, e.g.*, *United States v. Boyle*, 469 U.S. 241, 250 (1985), the reliance itself must be objectively reasonable in that the taxpayer supplied the professional with all the necessary information to assess the tax matter and that the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about, *see* 26 C.F.R. § 1.6664-4(c); *Ellwest Stereo Theatres, Inc. v. Comm'r*, 70

T.C.M. (C.C.H.) 1655 (T.C. 1995); *see also Zfass v. Comm'r*, 118 F.3d 184, 189 (4th Cir. 1997).

Thus, a taxpayer's reliance on the advice of a professional may constitute reasonable cause and good faith where the taxpayer proves by a preponderance of the evidence that: (1) the taxpayer reasonably believed that the professional upon whom the reliance was placed was an independent, competent adviser, without a conflict of interest, and with sufficient expertise to justify reliance; (2) the taxpayer provided all necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. *See SAS Inv. P's v. Comm'r*, 103 T.C.M. (CCH) 1845 (T.C. 2012) (citing *Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 98-99 (T.C. 2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); 26 C.F.R. § 1.6664-4(c)(1)).

The partnerships' argument that they are entitled to complete exculpation of negligence and disregard of tax laws and regulations because of Williams' reliance on the tax advice of Arnold & Porter, KPMG, and Williams' own attorneys at Baker Donelson, is a non-starter, however. The partnerships admit that Williams did not become a "controlling member" of Nevada until December 4, 2001 and of Carson until December 12, 2001. The record supports the findings by the IRS and the district court that the partnerships' FOCus-related negligence and disregard of tax laws, rules and regulations commenced prior to those dates. Before Williams became involved, the partnerships had already prearranged the unlawful FOCus tax avoidance scheme and had effectuated the Reno straddle trades lacking economic substance. Williams' subsequent reliance on tax law advice by counsel cannot serve retroactively to shield the partnerships from liability for their prior negligence and disregard of rules and regulations in formulating, promoting, and beginning to carry out the unlawful FOCus tax avoidance scheme.

No. 10-60559

Moreover, assuming without deciding that Williams, as "controlling member," acted within the scope of his authority to act for the partnerships in obtaining and relying on the tax opinions pertaining to the FOCus program from Arnold & Porter,[46] and assuming that Arnold & Porter was not only a competent adviser, but was also independent and conflict-free,[47] we conclude that the partnerships could not reasonably rely on Arnold & Porter's tax opinions in good faith because Williams and the partnerships failed to prove by a preponderance of the evidence that they supplied the professional with all pertinent information necessary to assess the purpose and elements of the transactions at issue as they were actually effectuated.

The advice upon which the taxpayer claims reliance "must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances."  26 C.F.R. § 1.6664-4(c)(1)(i); *see also id.* § 1.6664-4(c)(ii) (providing that professional advice must not be based upon a representation or

---

[46] The government argues that Williams could not act for the partnerships because Bricolage, not Williams, was the managing "administrative member."  Williams argues that, as the partnerships' "controlling member," he could so act.  The district court did not specifically address this issue, and we need not settle this dispute for the first time on appeal because, even assuming for the purposes of argument that Williams did act on behalf of the partnerships, the defense that the partnerships urge lacks merit.

[47] The evidence in the record suggests, but does not conclusively demonstrate, that Arnold & Porter suffered from a conflict of interest due to its prior representation of the Bricolage partnerships and the law firm's commitment to render a "more likely than not" opinion approving the FOCus program even before it was described and offered to Williams in the KPMG PowerPoint on October 2, 2001.  *Cf. Stobie Creek Investments LLC v. United States*, 608 F.3d 1355, 1382-83 (Fed. Cir. 2010) (affirming the district court's finding that a taxpayer was "objectively unreasonable" to rely on a the tax advice of two law firms because one firm was a "promoter" of the tax shelter at issue and the other law firm "was an agent of the promoter," thus putting a reasonable taxpayer on notice that the firms were not in a position to provide objective or financially disinterested advice); *Zfass*, 118 F.3d at 189 (affirming the rejection of taxpayer's defense that he relied on the advice of his accountant before proceeding with a tax shelter because, among other reasons, the taxpayer did not call the accountant as a witness and did not adduce evidence "to show what knowledge or information [the accountant] had regarding the investment . . . [or to] establish[ ] that [the accountant] was aware of the non-tax aspects of the plan").

37

assumption which the taxpayer knows, or has reason to know, is false or unlikely to be true). As the Arnold & Porter tax opinions clearly reflect, however, the facts and circumstances that deprived the pertinent transactions and the resulting tax loss of economic substance were not provided to the law firm by the partnerships. Specifically, the tax opinions do not set forth as a basis for analysis the precisely offsetting straddles that by design could not yield a profit, the embedding of the loss legs in Reno, the reallocation of the Reno gain legs to the transitory owners of Carson, the tightly collared Yen trade that could yield only a negligible profit or loss, or the unnecessary and gratuitous personal loan guarantee by Williams solely to increase his tax basis in Carson. Thus, the tax opinion letters did not analyze all of the pertinent facts and circumstances of the FOCus transactions and arrangements that the partnerships actually engaged in with the participation of Williams, Bricolage, and their transitory partners. In addition, the tax opinions were explicitly based on Williams' and the partnerships' misrepresentations that transactions were engaged in only for business purposes as "a practical and cost effective means for [Williams] to pursue [his] investment strategy." Thus, the letters omitted the key factor that the transactions between November and December 2001 had no purpose other than to create an $18 million tax loss deduction for Williams. In sum, the Arnold & Porter tax opinions were not based on all of the pertinent facts and circumstances necessary to analyze the purpose and elements of the FOCus transactions that the partnerships actually planned and carried out. Williams and the partnerships knew or had reason to know that the true purpose and the characteristics of the tax-motivated transactions were not set forth and discussed in the tax opinion letters, and that the tax opinions therefore could not be relied upon in good faith because they were not based on all of the relevant facts and circumstances.

No. 10-60559

The partnerships contend that, independently of Arnold & Porter, they relied on the advice of Williams' counsel at Baker Donelson.  However, the evidence supports the district court's finding that the attorneys at Baker Donelson relied on the Arnold & Porter opinions in rendering their advice, *Nevada Partners*, 714 F. Supp. 2d at 633, and, because the partnerships and Williams were aware of this, they could not reasonably rely on the advice of Baker Donelson independently of Arnold& Porter.  The district court concluded that Williams and the partnerships were "superbly educated, experienced and sophisticated investors," and that they did not reasonably rely in good faith on this advice under the circumstances. *Id.* at 640.  Consequently, the district court did not clearly err in finding that the partnerships failed to carry their burden of proving the defense of reasonable reliance in good faith so as to excuse them for their negligence and disregard of tax laws, rules and regulations.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's determinations that: (1) the FOCus transactions lacked economic substance and must be disregarded for tax purposes; (2) the negligence penalty is applicable and the partnerships are not entitled to the reasonable cause defense; and (3) the valuation misstatement penalty is inapplicable.  As to the remaining actions addressing the FPAAs premised on the government's alternative theory under Treasury Regulation § 1.701-2, and as to the district court's approval of the alternative substantial understatement penalty, we VACATE and RENDER judgment for the plaintiffs.