# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 9, 2018

Lyle W. Cayce
Clerk

No. 17-60145

ESTATE OF ROBERT C. DUNCAN, Deceased, Dan Duncan and Jan
Duncan, Co-Executors; JANNETTE DUNCAN,

Petitioners–Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent–Appellee

Appeals from a Decision of the
United States Tax Court

Before REAVLEY, SMITH, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Jannette Duncan and the estate of her late husband Robert C. Duncan (the Duncans) entered a series of settlement agreements with the IRS after audits revealed that the couple had used an abusive tax shelter and improperly taken bad-debt loss deductions. Under these agreements, the Duncans conceded all benefits related to the tax shelter, agreed they would not dispute the disallowance of substantially all of the bad-debt deduction, consented to immediate assessment and collection of taxes, penalties, and interest, and waived the right to contest their underlying tax liability. When the IRS attempted to collect, the Duncans argued that the IRS violated the agreement by recalculating the Duncans' tax liability. After the IRS Office of Appeals

No. 17-60145

(IRS Appeals) rejected that argument, the Duncans proposed an offer-in-compromise of $40,000 to settle their $3.4 million liability, which IRS Appeals declined. The Duncans appealed to the Tax Court, which rejected the Duncans' arguments. We affirm.

## I

Acting through RCD Investments, Ltd., in which the Duncans directly or indirectly held partnership interests, the Duncans participated in a Son-of-BOSS (SOB) transaction, a tax shelter designed to create artificial capital losses to offset real capital gains.[1] The transaction reduced the Duncans' individual income tax liability for 1999 and 2000. RCD Investments also claimed bad-debt deductions, which generated a net operating loss (NOL) for 2001. The Duncans carried the NOL back to claim a large tax refund for the 1996 tax year.

Robert Duncan died in 2003, leaving an estate with assets valued at over $8 million. Shortly before the inventory for Robert Duncan's estate was prepared, the IRS informed the Duncans that it would audit RCD Investments' tax returns. Months later, the Duncans agreed to participate in an IRS initiative offering reduced penalties to taxpayers who conceded the benefits of SOB transactions. They also agreed to the disallowance of the bad-debt deductions. To formalize these agreements, the Duncans and IRS executed several forms in December 2004. The Duncans signed Forms 4549 specifying their tax liability for 1996 and 2000. These forms reflected that the Duncans owed taxes, but attributed the deficiencies to the disallowance of the bad-debt deduction from 2001, not the SOB transaction. The parties also entered a Form 906 closing agreement, which required the Duncans to "concede all

---

[1] *See generally NPR Investments, LLC ex rel. Roach v. United States*, 740 F.3d 998, 1001 (5th Cir. 2014).

claimed benefits and attributes from the [SOB] transaction" and pay a 10% penalty on any deficiency related to the transaction.  The closing agreement stated that the Duncans "shall make full payment of their tax, penalties and interest resulting from the application of the forgoing [sic] paragraphs upon returning this executed closing agreement to the IRS."  At the time, the IRS's calculations (reflected on the Forms 4549) showed that the cancellation of the Duncans' SOB-related deductions did not create a tax deficiency, so the IRS countersigned the closing agreement without requiring payment.

The IRS later determined that the initial calculations of the Duncans' tax liability were incorrect.  The IRS sent updated Forms 4549 reflecting that the Duncans owed $82,858 for the 1996 tax year and $2,039,736 for 2000, including $739,880 from the cancellation of the SOB deduction and a penalty equal to 10% of that amount.  The Duncans signed the new Forms 4549 in July 2006, pursuant to which they waived their rights to appeal or contest their tax liability and consented to immediate collection.

When the IRS attempted to collect the tax, the Duncans disputed their tax liability for 1996 and 2000 in two collection due process (CDP) hearings. In the hearing for 1996, the Duncans submitted an offer-in-compromise premised on doubt as to liability.  The Duncans argued that they never agreed to the assessment and that the IRS failed to send them a notice of deficiency. IRS Appeals determined that by signing the Form 4549 for 1996, the Duncans had agreed to the 1996 tax liability and waived assessment restrictions, including the right to receive a notice of deficiency.  In the hearing for 2000, the Duncans disputed their underlying tax liability.  IRS Appeals concluded that the Duncans had waived challenges to their underlying liability by signing the closing agreement and Form 4549 for 2000.  IRS Appeals issued notices of determination sustaining the levies for both 1996 and 2000.

No. 17-60145

The Duncans appealed to the Tax Court, which consolidated the cases. The parties moved to remand so that IRS Appeals could consider the Duncans' new offer-in-compromise based on doubt as to collectability, and that motion was granted. The Duncans had offered $40,000 to settle their tax liability, which at that time was approximately $3.47 million. They asserted that Jannette Duncan had $545,897 in net assets and expected future income, but that special circumstances, namely Ms. Duncan's age (91), negligible earning potential, and payments to service life insurance loans and losses on an office building justified the $40,000 offer.

IRS Appeals concluded that there were no special circumstances and rejected the offer as not in the best interest of the United States. IRS Appeals did not compute the Duncans' precise reasonable collection potential (RCP). Instead, it estimated that the Duncans (1) owned $3.2 million in assets and (2) had dissipated approximately $3.4 million from Robert Duncan's estate, which the government would likely be able to recover through a lawsuit against the estate trustee. IRS Appeals also reasoned that calculating an exact RCP would be impossible because the Duncans' web of family partnerships and trusts—which owned interests in, loaned money to, and entered other related-party transactions with, one another—were too complex to value exactly. Based on its estimate of the Duncans' assets, the likelihood that the government could recover the full tax liability by suing the trustee, and the large gap between the $40,000 offer and the Duncans' own RCP estimate of $545,897, IRS Appeals rejected the offer and issued a notice of determination requiring the Duncans to pay their full tax liability.

When they returned to the Tax Court, the Duncans argued that IRS Appeals abused its discretion by (1) failing to verify that the IRS had complied

with "the requirements of any applicable law or administrative procedure"[2] in assessing the tax liabilities for 1996 and 2000 and (2) rejecting their offer-in-compromise. The Duncans also attempted to challenge their underlying tax liabilities, but the Tax Court held that the Duncans had waived the right to bring that challenge by signing the Forms 4549 agreeing to the tax liability.

With respect to the assessments, the Duncans argued that the IRS should have sent notices of deficiency before assessing the tax liabilities and that the closing agreement barred the assessments. The Tax Court rejected the notice-of-deficiency argument, which the Duncans do not appeal. The Tax Court also held that IRS Appeals did not abuse its discretion by failing to conclude that the closing agreement barred assessment of the tax liability. In doing so, it rejected the Duncans' argument that by countersigning the closing agreement without requiring payment from the Duncans, the IRS had implicitly represented that no tax related to the SOB transaction would ever be due. The court reasoned that the closing agreement did not purport to fix the tax liability for a specific tax year, but to memorialize that the Duncans would relinquish all benefits from the SOB transaction. In addition, the Tax Court ruled that IRS Appeals did not abuse its discretion by rejecting the Duncans' $40,000 offer-in-compromise or by basing that rejection on an inexact RCP estimate that included the trustee lawsuit and dissipated assets.

## II

This court reviews decisions of the Tax Court using the same standards we use to review the decisions of district courts.[3] We review findings of fact for clear error and legal questions de novo.[4] When reviewing the result of a CDP

---

[2] 26 U.S.C. § 6330(c)(1).

[3] *Rodriguez v. Comm'r*, 722 F.3d 306, 308 (5th Cir. 2013) (citing *Terrell v. Comm'r*, 625 F.3d 254, 258 (5th Cir. 2010)).

[4] *Terrell*, 625 F.3d at 254.

No. 17-60145

hearing in which the underlying tax liability is not properly at issue, the court must determine whether IRS Appeals abused its discretion.[5] The abuse of discretion standard likewise governs our review of IRS Appeals' rejection of an offer-in-compromise.[6] IRS Appeals abuses its discretion if it acts "arbitrarily, capriciously, or without sound basis in fact or law."[7]

## III

On appeal, the Duncans assert that by interpreting the closing agreement in the course of considering their argument that the closing agreement barred the IRS assessments, the Tax Court "rendered a decision on the merits of [their] underlying tax liabilities," in excess of its jurisdiction. The Duncans also challenge the Tax Court's holding about the offer-in-compromise, arguing that IRS Appeals abused its discretion by disregarding various procedures in the Internal Revenue Manual (IRM).

## A

The Tax Court correctly held that IRS Appeals did not abuse its discretion by concluding that the IRS properly assessed the Duncans' tax liabilities. The Tax Court did not exceed its jurisdiction by analyzing the closing agreement in order to reach that holding.

After the IRS assesses a tax, a taxpayer has ten days to pay or the IRS may, after providing notice,[8] levy upon the taxpayer's property.[9] Before the

---

[5] *Christopher Cross, Inc. v. United States*, 461 F.3d 610, 612 (5th Cir. 2006); *Goza v. Comm'r*, 114 T.C. 176, 182 (2000); *cf. Jones v. Comm'r*, 338 F.3d 463, 466 (5th Cir. 2003) ("In a collection due process case in which the underlying tax liability is properly at issue, the Tax Court (and hence this Court) reviews the underlying liability *de novo* and reviews the other administrative determinations for an abuse of discretion.").

[6] *Sego v. Comm'r*, 114 T.C. 604, 610 (2000).

[7] *Vinatieri v. Comm'r*, 133 T.C. 392, 400 (2009) (quoting *Woodral v. Comm'r,* 112 T.C. 19, 23 (1999)).

[8] *See* 26 U.S.C. § 6330(a).

[9] *Id.* § 6331(a).

No. 17-60145

IRS can levy, the taxpayer has a right to request a CDP hearing conducted by an impartial officer of IRS Appeals, an independent bureau of the IRS.[10] At the CDP hearing, the appeals officer must "obtain verification from the [IRS] that the requirements of any applicable law or administrative procedure have been met."[11] The taxpayer may "raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy, including (i) appropriate spousal defenses; (ii) challenges to the appropriateness of collection actions; and (iii) offers of collection alternatives," including offers-in-compromise.[12] Taxpayers may not challenge their underlying tax liability unless they did not receive a notice of deficiency or did not "otherwise have an opportunity to dispute the tax liability."[13] If the taxpayer wishes to challenge the underlying liability, he must "pay the asserted liability and file a refund suit in federal district court."[14]

If IRS Appeals issues a notice of determination sustaining the proposed levy, the taxpayer may appeal to the Tax Court.[15] The Tax Court's review is "limited to issues that were properly raised during the CDP hearing."[16] Thus, if a "challenge[] to the existence or amount of . . . underlying tax liability"[17] is not proper at a CDP hearing, the Tax Court may not consider it on appeal.[18] Taxpayers who sign a Form 4549—thereby consenting to the IRS's assessment

---

[10] *Id.* § 6330(b)(1),(3); *see also Keller Tank Servs. II, Inc. v. Comm'r*, 854 F.3d 1178, 1184 (10th Cir. 2017).

[11] 26 U.S.C. § 6330(c)(1).

[12] *Id.* § 6330(c)(2)(A).

[13] 26 C.F.R. § 301.6320-1(e)(3); 26 U.S.C. § 6330(c)(2)(B).

[14] *Keller*, 854 F.3d at 1189 (citing *Gorospe v. Comm'r*, 451 F.3d 966, 968 (9th Cir. 2006)).

[15] 26 U.S.C. § 6330(d)(1).

[16] *Keller*, 854 F.3d at 1189 (citing *Goza v. Comm'r*, 114 T.C. 176, 182-83 (2000)); *see also* 26 C.F.R. § 301.6330-1(f), Q & A-F3.

[17] 26 U.S.C. § 6330(c)(2)(B).

[18] *See Goza*, 114 T.C. at 182-83.

## No. 17-60145

of taxes for a given tax year—"cannot [later] challenge the tax liability to which they have consented" at a CDP hearing.[19]  In this case, the Duncans signed Forms 4549 for 1996 and 2000 and concede that doing so barred them from challenging the amount of their tax liabilities in the CDP hearings and before the Tax Court.

Even though they argued to the Tax Court that the closing agreement prevented the IRS from assessing the tax, the Duncans now reverse course and contend that by interpreting the closing agreement, the Tax Court impermissibly analyzed their underlying tax liability for 2000.  Essentially, the Duncans argue that while the Tax Court said it would not consider the underlying liabilities, it effectively did so by holding that the closing agreement "does not foreclose the IRS from determining liabilities in any particular amount" and did not contain anything "that barred assessment of the tax deficiencies and penalties to which [the Duncans] had expressly agreed."

The Duncans' argument is without merit.  Before the Tax Court, the Duncans argued that the closing agreement posed a legal impediment to assessment and requested that the case be remanded to IRS Appeals to verify "that the requirements of any applicable law . . . have been met."[20]  In addressing this argument, the Tax Court interpreted the closing agreement to confirm that there were no legal impediments to assessment.  Because closing agreements are legally binding on taxpayers and the IRS,[21] the Tax Court considered the closing agreement to ensure that IRS Appeals had verified that "requirements of applicable law" had been met and that assessment and collection were not otherwise inappropriate.[22]

---

[19] *Aguirre v. Comm'r*, 117 T.C. 324, 327 (2001).

[20] 26 U.S.C. § 6330(c)(1).

[21] *Id.* § 7121(b).

[22] *See id.* § 6330(c).

No. 17-60145

Viewed in this light, the Tax Court's evaluation of the closing agreement was not a de facto inquiry into the existence or amount of the Duncans' underlying tax liability. Rather, the Tax Court emphasized that "there is nothing in the . . . closing agreement that barred assessment of the tax deficiencies and penalties to which [the Duncans] had expressly agreed" and that the closing agreement "made no reference to the dollar amount of their tax liability for any year." The Tax Court's interpretation of the closing agreement ensured that the closing agreement did not pose a legal impediment to assessment or otherwise make collection inappropriate. The Tax Court did not consider the Duncans' underlying tax liabilities and thus did not exceed its jurisdiction.

## B

The Tax Court's interpretation of the closing agreement was also correct. The IRS has authority to enter closing agreements, which are final, binding determinations on the issues they address.[23] Form 906 closing agreements bind the parties as to "specific matters," rather than the tax liability for a particular year.[24] Courts interpret closing agreements using ordinary contract-law principles[25]—if the agreement is facially unambiguous, inquiry outside the four corners of the document is not appropriate.[26]

The closing agreement that the Duncans signed established that they "concede[d] all claimed benefits and attributes from the [SOB] transaction." It also provided that the Duncans "shall make full payment of their liability for tax, penalties and interest resulting from the application of the forgoing [sic] paragraphs, upon returning this executed closing agreement to the IRS." The

---

[23] *Id.* § 7121.

[24] *Zaentz v. Comm'r*, 90 T.C. 753, 761 (1988).

[25] *Smith v. United States*, 850 F.2d 242, 245 (5th Cir. 1988).

[26] *Rink v. Comm'r*, 100 T.C. 319, 325 (1993), *aff'd* 47 F.3d 168 (6th Cir. 1995).

Duncans argue that by countersigning the agreement and not demanding payment (because the IRS's contemporaneous calculations showed no tax due), the IRS implicitly agreed that no tax would be due in relation to the SOB transaction.

The Tax Court properly rejected this argument. The closing agreement did not fix the Duncans' tax liability for any particular year, but merely acknowledged that the Duncans would pay the correct taxes and penalties arising from the disallowance of the SOB deductions. Even though the agreement requires payment upon execution, it did not purport to settle the Duncans' tax liability. Instead, it required the Duncans to concede "all claimed benefits" from the SOB transaction and pay "any deficiency resulting from application of" the agreement. By its plain terms the closing agreement allowed the IRS to recalculate the Duncans' tax liability, and the IRS's failure to require payment upon execution—a fact extrinsic to the text of the unambiguous closing agreement—does not change that.

## C

The Tax Court was also correct to conclude that IRS Appeals did not abuse its discretion by rejecting the Duncans' offer-in-compromise. The IRS is statutorily authorized to settle tax liabilities in certain circumstances by entering an offer-in-compromise.[27] In general, "the decision to accept or reject an offer to compromise . . . is left to the discretion of the [IRS]."[28] The Duncans' offer was premised on doubt as to collectability, which exists when "the taxpayer's assets and income are less than the full amount of the [tax] liability."[29] To evaluate whether tax liability can be collected, the IRS

---

[27] 26 U.S.C. § 7122(a).
[28] 26 C.F.R. § 301.7122-1(c).
[29] *Id.* § 301.7122-1(b)(2).

considers the taxpayer's "reasonable collection potential" (RCP)—the amount the IRS could likely collect if it does not accept the offer.[30]    Although it generally declines offers that are less than the RCP,[31] the IRS may accept a lesser offer if there are special circumstances.[32]

The Duncans argue that IRS Appeals abused its discretion by not following the IRM in failing to (1) calculate the Duncans' exact reasonable collection potential, (2) ask an IRS field office to value the Duncans' complex assets, and (3) exclude dissipated assets.  The IRM contains internal operating procedures for the IRS.  The IRM is not legally binding and "do[es] not create rights in the taxpayer."[33]   However, courts can draw on IRM guidelines as factors to assess the propriety of IRS actions.[34]  In this case, any departures from the IRM did not rise to abuse of discretion.

**1**

First, IRS Appeals did not abuse its discretion by not determining the Duncans' exact RCP.  While the IRM directs IRS Appeals to calculate an RCP to evaluate doubt-as-to-collectability offers,[35] it does not require any particular level of precision.[36]  Given the disparity between the Duncans' $40,000 offer and their own estimated RCP of $545,897, IRS Appeals had ample justification

---

[30] Rev. Proc. 2003-71, 2003-2 C.B. at 517 § 4.02(2).

[31] *See id.*

[32] I.R.M. § 5.8.4.2.

[33] *Oxford Capital Corp. v. United States*, 211 F.3d 280, 285 n.3 (5th Cir. 2000); *Keado v. United States*, 853 F.2d 1209, 1214 (5th Cir. 1988) ("Procedures or rules adopted by the IRS are not law.").

[34] *See Oxford*, 211 F.3d at 285.

[35] I.R.M. § 5.8.4.3(2).

[36] *See id.* §§ 5.8.4.3.1, 5.8.4.9, 5.8.5.11(1).

to reject the offer.  As the Tax Court noted, determining the Duncans' RCP to a high degree of specificity would be a "meaningless exercise."

**2**

For similar reasons, IRS Appeals did not abuse its discretion by not seeking an expert to value the Duncans' assets.  The IRM instructs appeals officers confronted with complex assets to seek assistance from valuation specialists in field offices.[37]  IRS Appeals did not refer the Duncans' offer to specialists, but still noted that the Duncans' complex web of partnership assets were "impossible" to value.  Based on a handwritten list, the IRS Appeals officer arrived at an estimated RCP of $7.6 million, which included the estimated value of Jannette Duncan's partnership interests and the value of a potential lawsuit against the trustee of Robert Duncan's estate.

IRS Appeals' decision to estimate the value of the Duncans' assets was not an abuse of discretion.  Even though IRS Appeals used a somewhat simplistic valuation method to value Jannette Duncan's 21.82% interest in RCD Investments—21.82% of the partnership's assets minus its liabilities— rather than the market value of a minority stake, IRS Appeals had ample justification to reject the $40,000 offer.  IRS Appeals had good reason to be skeptical of the entity valuations the Duncans provided, which assigned most of the partnerships little to no value, and the appeals officer still relied on those valuations for many of the entities.  Moreover, the Duncans' $40,000 offer-in-compromise was significantly lower than their own $545,897 estimate of Jannette Duncan's assets.  The disparity is even greater relative to IRS Appeals' estimate, even if ignoring the interest in RCD Investments.  IRS Appeals thus did not abuse its discretion by not seeking an expert valuation.

---

[37] *Id.* § 8.23.3.3.1.2(4).

No. 17-60145

**3**

Finally, IRS Appeals did not abuse its discretion by considering dissipated assets from Robert Duncan's $8 million estate.  The IRM establishes that dissipated assets should generally not be used to calculate RCP except in certain circumstances.[38]  In cases where dissipated assets are included in RCP, the IRM establishes a three-year retrospective window unless the taxpayer dissipated the assets after being notified of audit.[39]  The IRM also instructs IRS Appeals to consider various factors before including dissipated assets and to document the amount of a reasonable assessment attributable to those assets.[40]

Even though it considered the value of Robert Duncan's estate more than ten years after the estate inventory in 2003, IRS Appeals did not abuse its discretion by going beyond the normal three-year window.  The Duncans received notices of audit in January 2003, days before the estate inventory was prepared, but nevertheless failed to pay any of the tax liability from the $8 million in estate assets.  Moreover, IRS Appeals was justified in considering the dissipation of the estate assets in connection with its evaluation of a potential lawsuit against the trustees of the estate.  One of the primary purposes of evaluating RCP is to determine whether the IRS could obtain the tax liability through legal action.[41]  The Department of Justice had expressed concrete interest in suing the trustee for the Duncans' tax liability, and since such a lawsuit would be foreclosed if IRS Appeals accepted the offer-in-compromise, IRS Appeals properly evaluated the facts underlying the potential lawsuit.  IRS Appeals did not abuse its discretion by questioning why the

---

[38] *Id.* § 5.8.5.18(1).

[39] *Id.* § 5.8.5.18(2), (3), (6).

[40] *Id.* § 5.8.5.18(3).

[41] Rev. Proc. 2003-71, 2003-2 C.B. at 517 § 4.02(2).

No. 17-60145

trustee failed to pay the taxes out of Robert Duncan's estate or by assigning potential collection value to a lawsuit against the trustee based on that failure.

**4**

On appeal, the Duncans do not argue that special circumstances justified an offer lower than their RCP. However, in their reply brief, the Duncans contend for the first time that IRS Appeals abused its discretion by failing to consider the Duncans' $545,897 RCP as an alternative offer if special circumstances did not exist. This court will not consider arguments first raised on appeal[42] and has held that "arguments raised for the first time in a reply brief are waived."[43] Because the Duncans did not raise their alternative-offer theory before the Tax Court and in its opening brief on appeal,[44] it is waived.

\*        \*        \*

For the foregoing reasons, we AFFIRM the judgment of the Tax Court.

---

[42] *See, e.g.*, *Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006).

[43] *Flex Frac Logistics, L.L.C. v. N.L.R.B.*, 746 F.3d 205, 208 (5th Cir. 2014) (citing *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir.2005)).

[44] *Id.*; *see In re Rodriguez*, 695 F.3d 360, 365 n.4 (5th Cir.2012) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal." (quoting *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994))).