# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-60833

United States Court of Appeals
Fifth Circuit

**FILED**
April 3, 2019

Lyle W. Cayce
Clerk

KEITH A. TUCKER; LAURA B. TUCKER,

Petitioners - Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee

Appeal from the Decision of the
United States Tax Court
T.C. No. 12307-04

Before HIGGINBOTHAM, GRAVES, and WILLETT, Circuit Judges.

PER CURIAM:*

Taxpayers Keith Tucker and Laura Tucker, husband and wife, claimed a $39,188,666 loss deduction for the 2000 tax year resulting from Mr. Tucker's execution of a "customized solution" to mitigate the Taxpayers' income tax. The customized solution (the "FX Transaction") involved highly-complex, interrelated foreign currency option investment transactions, which complied

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-60833

with a literal reading of the Tax Code[1] and generated millions in paper gains and losses. The Commissioner of Internal Revenue ("Commissioner") issued Taxpayers a notice of deficiency, disallowing the entire loss deduction and determining a $15,518,704 deficiency and a $6,206,488 penalty. Taxpayers challenged the deficiency and penalty in tax court. After a trial, the tax court upheld the deficiency, finding that Taxpayers were not entitled to their claimed deduction because the underlying transaction creating the deduction lacked economic substance. However, the tax court did not uphold the penalty. Taxpayers now appeal the tax court's decision on the deficiency. In this appeal, we consider: (1) whether it was appropriate for the tax court to apply the economic substance doctrine to the FX Transaction, and (2) whether the tax court applied the economic substance doctrine correctly.[2] After careful review of the record and hearing oral argument, we find that the economic substance doctrine was applicable to the FX Transaction, and the tax court applied the doctrine properly as set forth by circuit precedent. Accordingly, we AFFIRM the tax court's order and decision.

## BACKGROUND

Mr. Tucker's transactions at issue on this appeal involved several highly-complex, interrelated foreign currency option investment transactions. Because the tax court provided a robust overview of the facts demonstrating the complexity of the tax scheme, only facts that are relevant to the disposition of this appeal follow.[3]

---

[1] All "Tax Code," "Code," or "Section" references are to the Internal Revenue Code of 1986, as amended and in effect in 2000. All "Treasury Regulation" references are to the Treasury Regulations, as amended and in effect in 2000.

[2] The Commissioner does not appeal the Tax Court's decision on the penalty.

[3] The facts are gleaned from the tax court's factual findings, which we do not find to be clearly erroneous, *see Estate of Duncan v. Comm'r of Internal Revenue*, 890 F.3d 192, 197 (5th Cir. 2018), and the parties' stipulation of facts.

No. 17-60833

In 2000, Mr. Tucker, a certified public accountant with a juris doctor, was the Chief Executive Officer of Waddell & Reed Financial, Inc. ("WR"), a national mutual fund and financial services company. As a senior company executive, Mr. Tucker received tax advice and company-sponsored personal financial planning services through WR's Financial Planning Program from KPMG. When WR stock appreciated, KPMG anticipated that Mr. Tucker would exercise his WR stock options and experience a significant income increase. In August 2000, as KPMG anticipated, Mr. Tucker exercised 1,896,167 WR stock options, for which WR withheld approximately $11.4 million in federal income tax.

Sometime in 2000, KPMG advisors and Mr. Tucker discussed ways to diversify Mr. Tucker's investments and ways for Mr. Tucker to "mitigate his income tax" from exercising his stock options. In mid-December 2000, after failed attempts to enter into two separate tax benefit transactions, KPMG recommended, and Mr. Tucker accepted, the FX Transaction. KPMG characterized the FX Transaction as a "customized" tax solution to mitigate Mr. Tucker's 2000 income tax. The FX Transaction required Mr. Tucker to invest in foreign currency options in a series of transactions to take advantage of the Tax Code and to produce millions in paper gains and losses. Mr. Tucker was aware that the IRS might disallow a loss deduction from the transaction.

## I.    FX Transaction

The FX Transaction involved three new entities and two separate components of offsetting foreign currency options to produce the $39,188,666 tax deduction at issue in this case.

### A.    Relevant Entities

In late December 2000, Mr. Tucker organized three new entities, Sligo (2000), LLC ("Sligo LLC"), Sligo (2000) Company, Inc. ("Sligo"), and Epsolon, Ltd, to execute the FX Transaction. Sligo LLC was a Delaware limited liability

No. 17-60833

company and Mr. Tucker was its sole member. Sligo was an S Corporation incorporated under Delaware law, and Mr. Tucker wholly-owned the company. Sligo was a U.S. shareholder of Epsolon, an Irish shelf company, and Sligo owned 99% of the shelf company from December 18, 2000 to December 31, 2000. Sligo's 99% ownership of Epsolon resulted in Epsolon initially being classified as a controlled foreign corporation ("CFC")[4] for federal tax purposes. Effective December 27, 2000, however, Epsolon elected partnership classification and was no longer considered a CFC.

Mr. Tucker contributed $2,024,700 in cash to Sligo, and Sligo contributed $1,514,700 to Epsolon.

### B.     Epsolon Loss Component

Mr. Tucker generated approximately $39 million in claimed tax loss through Epsolon by artfully constructing his investments to comply with a mechanical reading of the Code. As the tax court explained:

> Epsolon executed the loss component in four steps:
> (1) Epsolon acquired various offsetting foreign currency digital option spread positions (spread positions); (2) it disposed of the gain legs of the spread positions while Epsolon was a CFC; (3) it made a 'check-the-box' election to become a partnership for U.S. tax purposes; and (4) it disposed of the loss legs of the spread positions.

*Tucker v. Comm'r of Internal Revenue*, 114 T.C.M. (CCH) 326, 2017 WL 4158704, at *13 (T.C. 2017).

**On December 20, 2000**, Epsolon, while a CFC, purchased from and sold to Lehman Brothers eight foreign euro currency options tied to the U.S. Dollar, where each set of options created a spread. The total premium for the options

---

[4] A CFC is any foreign corporation of which more than 50% of the vote or value is owned by U.S. shareholders.

4

No. 17-60833

Epsolon purchased was $156,041,001, and the total premium for the options that Epsolon sold was $157,500,000. The net premium payable to Epsolon for the options was $1,458,999. The potential return on the investment was based on the volatility of the USD/euro exchange rate. Mr. Tucker understood that the options had a 40% chance of profitability.

**On December 21, 2000**, the euro appreciated against the dollar, and Epsolon realized a net gain of $51,260,455 after disposing of four of its euro options. As a CFC, Epsolon's $51 million gain was not subject to federal income tax. *See* Sec. 881 & Sec. 882(a)(1). Epsolon then purchased from and sold to Lehman Brothers foreign deutschemark ("dem") options using most of the proceeds from the disposition of the euro options.

**On December 27, 2000**, Epsolon's status as a CFC effectively ended with its "check-the-box" election[5] for partnership classification. With Epsolon's entity classification change to partnership, Epsolon was treated as liquidating and distributing its assets and liabilities to Sligo. Under the "Section 367 election,"[6] Epsolon's $51 million gain as a CFC did not carry over to the partnership. Under the "30-day rule,"[7] Sligo was not required to report Epsolon's gain as taxable income because Epsolon was a CFC for only nine days.

**On December 28, 2000**, Epsolon, as a partnership, disposed of some of its dem and euro options, which resulted in a net loss of $39,584,511. Epsolon's loss flowed through to Sligo. Sligo, as 99% owner of Epsolon, claimed a 99%

---

[5] A "check-the-box" election "allows taxpayers to choose whether an entity will be characterized as a corporation for tax purposes." *See* Treas. Reg. § 301.7701-3(g)(1)(ii).

[6] The Section 367 election "allowed taxpayers to elect to include in income either the CFC's [earnings and profits] amount or the amount of gain realized in the liquidation." *See* Treas. Reg. § 1.367(b)-3T(b)(4)(i)(A).

[7] Under the "30-day rule" a CFC's income is "taxable to a U.S. shareholder only if the U.S. shareholder owned the CFC for 30 or more days in a taxable year."

No. 17-60833

share of Epsolon's loss of $39,188,666. Sligo's reported share of the loss passed through to Mr. Tucker. *See* 26 U.S.C. § 704(d)(1) (limiting share of partnership loss to adjusted basis of partner's interest). Taxpayers reported the $39,188,666 loss as a deduction on their 2000 tax form.

### C. Sligo LLC Basis Component

Taxpayers have conceded the manipulation of the Sligo Basis Component, in which Mr. Tucker inflated his basis in Sligo. However, they argue that they are entitled to a basis in Sligo of $2,024,700, which is what Mr. Tucker purportedly made to Sligo in cash contributions.

**On December 21, 2000**, Sligo LLC purchased from and sold to Lehman Brothers Japanese yen currency options tied to the U.S. dollar. While the premium for the purchased yen option was $51 million, the premium for the sold yen option was $50,490,000, making the net premium from Sligo LLC to Lehman Brothers $510,000.

**On December 26, 2000**, Mr. Tucker transferred his 100% ownership interest in Sligo LLC to Sligo. Mr. Tucker claimed a $53 million basis in Sligo, calculated as the $51 million premium paid for the yen option plus $2,024,700 in purported cash contributions, without accounting for the premium received for the yen options. The increased basis would permit Mr. Tucker to take full advantage of the Epsolon loss for tax purposes.

## II. Taxpayers' 2000 Tax Return

On March 26, 2001, Taxpayers filed a joint tax return for the 2000 tax year. Taxpayers reported $44,187,744 in wages and salaries, including $41,034,873 in gain from Mr. Tucker's WR stock options, and Taxpayers reported the $39,188,666 Epsolon loss as a deduction. Taxpayers reported another $13 million in passthrough loss from Sligo on their 2001 tax return. In total, Taxpayers reported over $52 million in loss for 2000 and 2001. On April 15, 2004, the Commissioner issued Taxpayers a notice of deficiency,

No. 17-60833

disallowing the entire loss deduction and determining a $15,518,704 deficiency and a $6,206,488 accuracy-related penalty.

### III.   The Tax Court's Decision

In tax court, Taxpayers challenged the Commissioner's disallowance and argued, *inter alia*, that Taxpayers were permitted to deduct the Epsolon loss to the extent of Mr. Tucker's basis in Sligo.  The Commissioner argued, *inter alia*, that the transactions underlying the claimed loss lacked economic substance.  The tax court agreed with the Commissioner, applied the economic substance doctrine to Mr. Tucker's transaction, and upheld the Commissioner's disallowance.

This appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the tax court's final decision under 26 U.S.C. § 7482(a)(1).

We review the facts used to determine whether a transaction lacks economic substance for clear error, and we review the ultimate determination of whether a transaction lacks economic substance *de novo.  See Estate of Duncan*, 890 F.3d at 197; *Nevada Partners Fund, L.L.C. ex rel. Sapphire II, Inc. v. U.S. ex rel. I.R.S.*, 720 F.3d 594, 610 (5th Cir. 2013), *vacated on other grounds by* 571 U.S. 1119 (2014).

## DISCUSSION

### I.   Economic Substance Doctrine

"The economic substance doctrine allows courts to enforce the legislative purpose of the Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality." *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 543 (5th Cir. 2009).  While "taxpayers have the right to decrease or avoid taxes by legally permissible

7

means," "transactions which do not vary control or change the flow of economic benefits are to be dismissed from consideration." *Id.* (citations omitted).

The doctrine has emerged from the Supreme Court's decision in *Gregory v. Helvering*, 293 U.S. 465 (1935). The Court reviewed a taxpayer's series of transactions to determine "whether what was done, apart from the tax motive, was the thing which the statute intended." *Id.* at 469. The Court found that the transactions fell outside the Code's plain intent, even though the transactions were technically consistent with the Code. *Id.* at 469–70.

In *Southgate*, this court applied the economic substance doctrine to determine the tax consequences of three interrelated transactions, noting that "a transaction's tax consequences depend on its substance, not its form." *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 478–79 (5th Cir. 2011). The court noted that the economic substance doctrine, "empower[s] the federal courts to disregard the claimed tax benefits of a transaction—even a transaction that formally complies with the black-letter provisions of the Code and its implementing regulations—if the taxpayer cannot establish that 'what was done, apart from the tax motive, was the thing which the statute intended.'" *Id.* at 479 (quoting *Gregory*, 293 U.S. at 469).

The tax court applied the economic substance doctrine to the FX Transaction and determined that the transaction lacked economic substance. Taxpayers raise two issues on appeal. First, Taxpayers argue that the tax court erred in applying the economic substance doctrine. Second, Taxpayers argue, if the economic substance doctrine is applicable, the tax court did not apply the doctrine properly. We find no error in the tax court's decision.

## II.    The Economic Substance Doctrine is Applicable to the FX Transaction

The tax court applied the economic substance doctrine to the FX Transaction because Taxpayers "offered nothing to indicate that Congress intended to provide the tax benefits they seek through the formal application of the Code and the regulations without conforming to economic reality." *Tucker*, 2017 WL 4158704, at \*17.  Looking in isolation at each tax rule used to implement the FX Transaction and heavily relying on extra-circuit precedent, Taxpayers argue that the economic substance doctrine is inapplicable because the transaction complied with a literal reading of the Code.

The Supreme Court and this court have applied the economic substance doctrine to transactions that technically complied with tax laws.  In *Gregory*, the Court looked beyond the form of the transaction to consider its economic substance.  293 U.S. 465.  Despite the taxpayer's literal compliance with the Code, the Court concluded that:

> [t]he whole undertaking, though conducted according to the terms of [the statute], was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The . . . transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

*Id.* at 470.  In *Nevada Partners*, the taxpayers implemented a multi-step investment strategy that was technically consistent with the Code.  720 F.3d at 600.  This court applied the economic substance doctrine in that case, which also involved a complex foreign currency transaction.  *Id.* at 610–14.

In this matter, while the FX Transaction was consistent with the Code's language, it looked like "[t]he whole undertaking . . . was in fact an elaborate

No. 17-60833

and devious" path to avoid tax consequences. *Gregory*, 293 U.S. at 470. As the tax court noted, the following resulted in the Taxpayers' $39 million tax loss deduction:

> (1) Epsolon realized an aggregate gain of $51,260,455 in 2000 when it disposed of four euro options on December 21, 2000.
>
> (2) Epsolon did not recognize the $51,260,455 gain for U.S. tax purposes because (i) Epsolon was a foreign corporation not subject to tax under section 881 or 882[8] at the time of the gain and (ii) Sligo was not required to include its share of Epsolon's gain under section 951 because Epsolon was a CFC for less than 30 days when it elected partnership status.
>
> (3) Epsolon and Sligo were not required to recognize gain or loss when Epsolon elected partnership status because Epsolon made an election that allowed it to recognize gain equal to Sligo's basis in its Epsolon stock and Sligo had a zero basis in its Epsolon stock. *See* sec. l.367(b)-3T(b)(4)(i)(A), Temporary Income Tax Regs., 65 Fed. Reg. 3588 (Jan. 24, 2000).
>
> (4) After Epsolon became a U.S. partnership, it disposed of an additional four foreign currency options for a net loss of $38,483,893 and transaction costs of $1,100,618 in 2000 for a total loss of $39,584,511.
>
> (5) Sligo was required to take into account its distributive share of Epsolon's net loss, which passed through to Mr. Tucker, as Sligo's S

---

[8] Sec. 881 imposes a tax of 30% on foreign corporations on amounts of "fixed or determinable annual or periodical gains" income from sources within the United States. Sec. 882(a)(l) taxes foreign corporations on income "effectively connected with the conduct of a trade or business within the United States."

> corporation shareholder, and the loss was deductible under section 165(a) and characterized as ordinary under section 988.

*Tucker*, 2017 WL 4158704, at *12.

It was appropriate for the tax court to apply the economic substance doctrine to the transaction to determine whether "what was done, apart from the tax motive, was the thing which the statute intended." *Southgate*, 659 F.3d at 479 (quoting *Gregory*, 293 U.S. at 469). Accordingly, the tax court did not err in applying the economic substance doctrine to the FX Transaction.

Taxpayers rely heavily on *Summa Holdings, Inc. v. Comm'r of Internal Revenue*, 848 F.3d 779 (6th Cir. 2017), to support their position that the tax court erred in applying the economic substance doctrine to the FX Transaction. In *Summa Holdings*, the Sixth Circuit reviewed the tax court's decision denying relief to a family who sought to lower their taxes by using a domestic international sales corporation ("DISC") "to transfer money from their family-owned company to their sons' Roth Individual Retirement Accounts." *Summa Holdings*, 848 F.3d at 779. The court did not apply the economic substance doctrine to the transactions because it was "not a case where the taxpayers followed a devious path to a certain result in order to avoid the tax consequences of the straight path." 848 F.3d at 788 (quotation marks and citation omitted). The Sixth Circuit found the doctrine was inapplicable because none of the transactions "was a labeling-game sham or defied economic reality," and the tax provisions used were designed for tax-reduction purposes. *Id.* at 786. The court concluded that "[a]lthough the distinction between transactions that obscure economic reality and Code-compliant, tax-advantaged transactions may be difficult to identify in some cases, the transactions in [*Summa Holdings*] are clearly on the legitimate side of the line." *Id.* at 788.

That clarity is simply not present in Mr. Tucker's transactions. The tax court concluded that Congress "neither contemplated nor intended to encourage this type of mechanical manipulation of the rules" that permits Mr. Tucker to avoid recognizing a $51 million gain. *Tucker*, 2017 WL 4158704, at \*16. The tax court found that Mr. Tucker's manipulation of the rules was contrary to Congress' intent. *See id.* (noting that S. Rept. No. 87-1881 (1962), 1962-3 C.B. 707, 785, subpart F, which includes the 30-day rule, was "designed to end tax deferral on 'tax haven' operations by U.S. controlled corporations"); *id.* (citing to the preamble to the regulation which promulgated the check-the-box election and finding that Mr. Tucker's use of the partnership election "to ignore economic reality and to separate Epsolon's gains from its losses" was inconsistent with legislative intent). The tax court concluded that Mr. Tucker's calculated manipulation of the tax code "assured that [he] would have the loss he needed to offset his WR stock option income without the need to recognize the offsetting gain on the options." *Id.*

While, "the line between disregarding a too-clever-by-half accounting trick and nullifying a Code-supported tax-minimizing transaction can be elusive," *Summa*, 848 F.3d at 787, the line is clear here. Accordingly, even under *Summa Holdings*, it was appropriate for the tax court to apply the economic substance doctrine to determine whether the transactions "defied economic reality." *Id.* at 786.

## III.   The FX Transaction Lacks Economic Substance

The tax court applied the economic substance doctrine to the FX Transaction and concluded that the transaction lacked economic substance. Taxpayers argue that "even if the Tax Court was correct in its decision to apply the economic substance doctrine . . . the Tax Court erred in the manner in which it applied that doctrine." Specifically, the tax court erred in disregarding

the fact that the transactions had a 40% chance to earn profit and concluding that Mr. Tucker had no non-tax purpose.

When applying the economic substance doctrine, this court will respect "a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84 (1978). "In other words, the transaction must exhibit [1] objective economic reality, [2] a subjectively genuine business purpose, and [3] some motivation other than tax avoidance." *Southgate*, 659 F.3d at 480. "While 'these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes,' there is near-total overlap between the latter two factors." *Id.* (quoting *Klamath*, 568 F.3d at 544). Prongs two and three may be read as one prong because "[t]o say that a transaction is shaped totally by tax-avoidance features is, in essence, to say that the transaction is imbued solely with tax-dependent considerations." *Id.* at 480 n.40. Accordingly, the economic substance doctrine effectively has two prongs: an objective economic prong and a subjective business purpose prong. *See id.* at 480–82.

"A notice of deficiency issued by the IRS is 'generally given a presumption of correctness, which operates to place on the taxpayer the burden of producing evidence showing that the Commissioner's determination is incorrect.'" *Nevada Partners*, 720 F.3d at 610 (quoting *Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 387 (5th Cir. 1995)). "[W]hen the taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006).

The tax court concluded that the FX Transaction failed both prongs of the economic substance doctrine. Taxpayers argue that the tax court "misapplied each prong of the analysis." Because we conclude that the FX Transaction fails the objective economic prong, we affirm the tax court's decision.

In the first prong of the economic substance analysis, we must determine whether the FX Transaction lacks objective economic reality. *Klamath*, 568 F.3d at 544–45. "[T]ransactions lack objective economic reality if they 'do not vary, control, or change the flow of economic benefits.'" *Southgate*, 659 F.3d at 481 (citation and alteration omitted). "This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so." *Id.* (citations omitted). "[The] inquiry must be 'conducted from the vantage point of the taxpayer at the time the transactions occurred, rather than with the benefit of hindsight.'" *Id.* (quoting *Smith v. Comm'r*, 937 F.2d 1089, 1096 (6th Cir. 1991)).

Taxpayers argue that the tax court erred in disregarding the profit potential of the FX Transaction. They argue that the FX Transaction "created the realistic probability that real dollars would change hands" because Mr. Tucker had a 40% chance to generate a net profit of $487,707 for the investments. The tax court found that the FX Transaction defied objective economic reality because the "$487,707 potential profit is de minimis as compared to the expected $20 million tax benefit" and the "$52.9 million in tax losses over two years," including the $39 million at issue. *Tucker*, 2017 WL 4158704, at *20. We agree.

"A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits." *Portland Golf Club v. Comm'r*, 497 U.S. 154, 169 n.19 (1990) (quoting *Gefen v. Comm'r*, 87 T.C. 1471, 1490 (1986));

*see Southgate*, 659 F.3d at 481 & n.43.  In *Nevada Partners*, this court concluded that the district court did not err in determining that the taxpayers "failed to meet their burden of proving that the transactions giving rise to the $18 million tax loss in question had economic substance." 720 F.3d at 610.  The court found that the record objectively demonstrated that the series of transactions were not designed to make a profit. *Id.* at 610–611.  In fact, the transactions "serve[d] no other purpose than to provide the structure through which [the taxpayer] could enjoy the $18 million reduction to his personal 2001 tax burden." *Id.* at 611.  The court also found that the series of transactions lacked profit motive where the transactions were designed to ensure "a relatively insignificant range [of profit] in comparison with the $18 million tax benefit . . . ." *Id.* at 612–13.  The court concluded that the profit "was a 'relative pittance' that did 'not appreciably affect [the] beneficial interest[.]'" *Id.* at 613 (quoting *Knetsch v. United States*, 364 U.S. 361, 366 (1960)).

Considering the parties' expert report, the tax court found that there was a low likelihood, between 16% and 40%, that the FX Transaction would be profitable because the options were "egregiously" mispriced against Mr. Tucker.  The tax court concluded that:

> [T]he Epsolon loss component was not designed to make a profit, but rather arranged to produce a $52.9 million artificial loss. The scheme involved separating the gains from the losses by allocating the gains to Epsolon while it was a CFC, checking the box to become a partnership, subsequently recognizing the losses, and creating a tiered passthrough-entity structure through which to claim the artificial losses. No element of the Epsolon loss and Sligo LLC basis components had economic substance; each was orchestrated to serve no other purpose than to provide the structure through which [Taxpayers] could reduce their 2000 and 2001 tax burden.

*Tucker*, 2017 WL 4158704, at \*23.

No. 17-60833

Looking at the FX Transaction as a whole,[9] we agree with the tax court and conclude that the transaction failed the objective economic prong because there was no reasonable possibility of profit and there was no actual economic effect.   Because "the absence of any one of [the prongs] will render the transaction void for tax purposes," we need not determine whether the FX Transaction passes the subjective business purpose prong.   *Southgate*, 659 F.3d at 480.

## CONCLUSION

For the foregoing reasons, we AFFIRM the tax court's decision.

---

[9] *See Salty Brine I, Ltd. v. United States*, 761 F.3d 484, 495 (5th Cir. 2014) (stating that "a court must look at the transaction as a whole to determine the economic substance").

16